SCION BRECKENRIDGE MANAGING MEMBER, LLC, Scion 2040 Managing Member, LLC and Scion Dwight Managing Member, LLC, Defendant Below Appellants,

v.

ASB ALLEGIANCE REAL ESTATE FUND, EBREF Holding Company, LLC and Dwight Lofts Holdings, LLC, Plaintiffs Below Appellees.

No. 437, 2012.

Supreme Court of Delaware.

Submitted: March 27, 2013.
Decided: May 9, 2013.

Gregory P. Williams (argued) and Kelly E. Farnan, Richards, Layton & Finger, P.A., Wilmington, Delaware. Of Counsel: Kenneth T. Brooks and Richard J. Zecchino, Honigman Miller Schwartz and Cohn LLP, Lansing, Michigan for appellants.

John L. Reed and Scott Czerwonka, DLA Piper LLP, Wilmington, Delaware. Of Counsel: Bruce E. Falby (argued), Bruce S. Barnett and Justin Brown, DLA Piper LLP, Boston, Massachusetts for appellees.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices constituting the Court en Banc.

STEELE, Chief Justice:

■ In this reformation action concerning cash flow distributions in three real estate joint venture agreements, we hold that the Vice Chancellor properly reformed the agreements on the basis of unilateral mistake and knowing silence by the other party. Negligence in discovering an alleged mistake does not bar a reformation claim unless the negligence is so significant that it amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing. Ratifying a contract does not create an equitable bar to reformation unless the ratifying party had actual knowledge of the mistake giving rise to the reformation claim. We reverse the Vice Chancellor's fee award because a contractual fee-shifting provision incorporating the words "incurred" and "reimburse" does not apply where counsel for the party seeking fees represented the party free of charge to avoid a malpractice claim. We also clarify that 10 *Del. C.* § 5106's reference to "costs" does not include attorneys' fees.

## I. FACTUAL AND PROCEDURAL HISTORY [1]

Rob and Eric Bronstein [2] cofounded (and remain principals of) The Scion Group, LLC.[3] ASB Capital Management, LLC, is the registered investment adviser for approximately 150 pension funds (ASB or the Funds). Between January 2007 and January 2008, ASB-advised pension funds [4] entered into five joint ventures for the ownership, operation, and development of student housing projects through special purpose entities.[5] Keyvan Arjomand, Scion's primary contact at ASB, negotiated the agreements with Rob. ASB's presi-

1. The facts in this section are taken from the Vice Chancellor's Memorandum Opinion, *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 2012 WL 1869416 (Del.Ch. May 16, 2012), and his Fee Award Opinion, *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434 (Del.Ch.2012).

2. This Opinion refers to the Bronstein brothers by their first names ("Rob" and "Eric") for clarity.

3. Rob Bronstein is an experienced real estate consultant, and his brother Eric has signifi-

cant experience as counsel in real estate ventures. Between 2002 and 2006, Scion served as the sponsor or developer on fifteen student housing real estate joint ventures in which Scion made equity investments totaling $12.2 million.

4. For simplicity, the remainder of this Opinion refers to actions taken by the Funds as actions taken by ASB.

5. The parties created a Delaware LLC for each project.

dent, Robert Bellinger, actively oversaw the negotiations and personally approved each venture. ASB's Real Estate Investment Advisory Committee also approved the investments based on internal memorandums.

Rob testified that he left the "wordsmithing" of the agreements to Eric. ASB relied on DLA Piper LLP as outside counsel. DLA Piper partner Barbara Trachtenberg drafted and negotiated the first joint venture agreement, the University Crossing project. After that, she ceded most of the drafting responsibility to Cara Nelson, a junior associate who only had been working on real estate joint venture deals for a few months.

Real estate joint venture projects generally follow a basic framework: a promoter provides the bulk of the capital and a sponsor arranges the deal and manages the property.[6] ASB served as the promoter in each of the five ASB–Scion joint ventures, providing at least 99% of the capital and retaining at least 99% of the equity. Scion served as the sponsor and invested no more than 1% of the capital. Scion earned a management fee for overseeing the project's day-to-day operations, as well as a leasing fee and an acquisition fee. Scion primarily earned its compensation, however, through an incentive payment known as a "promote."[7]

Generally, a promote is triggered once the project generates a specified preferred return on the invested capital. Once the project achieves the specified preferred return, the promote rewards the sponsor with a greater proportion of the project's profits.[8] Real estate professionals commonly discuss promotes using industry shorthand, in which they describe the economics as "an $X$ over a $Y$."[9] For example, the phrase "20% over an 8%" means the sponsor would receive 20% of incremental profits after the project generated an 8% preferred return.

The Vice Chancellor found that Arjomand and Rob negotiated Scion's compensation using industry shorthand. In an October 2, 2006 email, Arjomand proposed a "20% above an 8% preferred return;" Rob replied the next day that he was "probably okay with the promote structure." Neither side questioned the shorthand's meaning or sought to clarify whether Scion would get its promote before ASB recovered its initial capital investment.

The parties' first joint venture, the University Crossing LLC Agreement, incorporated the promote and preferred return terms Rob and Arjomand discussed into

---

**6.** *See* Alvin L. Arnold, *Real Estate Investor's Deskbook* § 6:109 (3d ed.2012); *see also* James Geoffrey Durham, Debra Pogrund Stark & Thomas R. White, III, *Commercial Real Estate Transactions: A Project and Skills Oriented Approach* § 2.01 at 47–48 (2d ed.2009).

**7.** The promote pays a sponsor an agreed-upon portion of the cash flows generated by operations or by a capital event such as a sale or refinancing of the joint venture property. It incentivizes the sponsor to increase the project's profitability. *See* Arnold, *supra* note 6.

**8.** *See id.*

**9.** *X* refers to the disproportionate share of profits the sponsor will receive; *Y* refers to the preferred return on capital that will trigger the promote. *See* Stevens A. Carey, *Real Estate JV Promote Calculations: Basic Concepts and Issues*, Real Est. Fin. J., Spring 2003, at 3, *available at* http://www.pircher.com/data/REJVPrCal.pdf.; *see also ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, No. 5843–VCL, at 12–14, 134, 251 (Del. Ch. Mar. 12, 2012) (TRANSCRIPT); *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, No. 5843–VCL, at 602–05, 615–620, 741–42 (Del. Ch. Mar. 14, 2012) (TRANSCRIPT).

the Sales Proceeds Waterfall, which provided, in relevant part:

(ii) Second, among the Members in proportion to the Unrecovered 8% Preferred Return Amounts of the Members at such time, until such time as each Member's Unrecovered 8% Preferred Return Amount has been reduced to zero;

(iii) Third, among the Members in proportion to the Invested Capital of the Members at such time, until such time as each Member's Invested Capital has been reduced to zero;

(iv) Fourth, (x) the Remaining Percentage to the Members in proportion to each Member's respective Percentage Interests at such time, and (y) the Promote Percentage to Venture Partner.

The LLC Agreement defined the Promote Percentage and the Remaining Percentage as 20% and 80%, respectively. In effect, the Waterfall provided that the parties would receive distributions in proportion to their respective percentage equity investments, approximately 99% for ASB and 1% for Scion, until each member received an amount equal to an 8% preferred return on that investment. Therefore, distributions would continue at a 99:1 ratio until each member recovered its initial capital investment. Only after ASB recovered its investment would Scion receive a promote payment equal to 20% of the excess profits, with ASB and Scion splitting the remaining 80% according to their 99:1 equity ratio.

The parties' second joint venture, Millennium Bloomington Apartments, LLC, mirrored the University Crossing terms.

Scion had asked for higher acquisition and management fees on the Millennium deal, but ASB had refused. Rob continued to seek greater compensation for Scion, discussing a two-tier promote structure in the context of a proposed project that the parties ultimately abandoned.[10] Discussions continued, however, and in a March 20, 2007 email, Arjomand told Rob that Bellinger wished to structure deals with lower fees but a higher promote that would incentivize the sponsor to earn greater compensation through successful property management. Rob responded that he understood and was open to reducing his fees in exchange for greater promote compensation.

The parties continued to negotiate a trade-off between fees and promote consideration. In May 2007, Arjomand sent an email titled "ASB/Scion General Deal Parameters Going Forward," which summarized the deal structure that he believed both sides had finally negotiated: **"Promote**—On an unlevered deal, 20% over an 8%, and 35% over a 12%. On a levered deal, 20% over a 9%, and 35% over a 15%" (the May 2007 Terms). Rob replied the next day stating that he "agree[d] with all this." Arjomand forwarded these terms to the entire deal team on May 22, describing them as "the basic economics of our deal format with Scion on a go forward basis."

The parties entered into their third joint venture, Breckenridge, LLC, in June 2007. DLA Piper used the Millennium LLC Agreement as a template and made deal-specific adjustments to prepare the initial draft of the Breckenridge LLC Agreement. Nelson circulated the first draft on

---

**10.** In negotiating this project, Rob suggested a two-tier promote where Scion would receive "20% of returns above an 8% preferred return—and 30% of returns above 12%." The Vice Chancellor found that neither Rob nor Arjomand asked about the industry shorthand or whether Scion could earn its promote if ASB did not recover its capital. The Vice Chancellor found that the second level of promote contemplated an additional level of incentive compensation on a *profitable* deal.

June 14, 2007. Although DLA Piper revised both the operational cash flow waterfall and the Sale Proceeds Waterfall to add the second tier of preferred return, the waterfalls only included one level of promote. Eric replied the same day and identified the problem. The Vice Chancellor found that Eric did not intend in his email to alter the economic terms for the Sale Proceeds Waterfall but rather to memorialize accurately the two-tier promote structure to which Rob and Arjomand had agreed.

Nelson revised the Waterfall provisions, but her June 15, 2007 draft of the LLC Agreement placed the missing first-tier promote after the first preferred return provision, but before the return of capital provision in the Waterfall.[11] This placement meant that Scion would begin to earn its promote immediately after the project satisfied its first preferred return amount but before the parties recovered their initial capital investment. Despite these significant consequences, no one commented on the change.

Eric testified that he reviewed the Waterfall in detail. The Vice Chancellor found that Eric realized that the first-tier promote appeared before the return of capital and understood that Scion would benefit from this error.[12] Trachtenberg could not recall whether she read the drafts before Nelson circulated them, but if she did, she must not have focused on the Waterfall because "it's just wrong. It's a terrible translation of the [May 2007 Terms]." [13] Nelson conceded that she did not have the experience to understand the Waterfall provisions at the time and only learned of the mistake when Trachtenberg explained it to her in the fall of 2010.

After one minor change,[14] the parties executed the Breckenridge deal agreement with the following relevant parts of the Sale Proceeds Waterfall:

(ii) Second, among the Members in proportion to the Unrecovered First Preferred Return Amounts of the Members at such time, until such time as each Member's Unrecovered First Preferred Return Amount has been reduced to zero;

(iii) Third, (x) the Remaining Percentage [80%] to the Members in proportion to each Member's respective Percentage Interest at such time, and (y) the Promote Percentage [20%] to Venture Partner [Scion] until such time as the Fund's

---

11. Profits under the Waterfall would flow, in relevant part to satisfy: (1) the first preferred return amount; (2) the second preferred return amount, but split according to the first promote percentage; and then (3) to satisfy the return of capital.

12. Eric initially tried to argue he had negotiated the change, but the Vice Chancellor found that explanation lacked credibility based on other conflicting testimony.

13. Nelson explained DLA Piper did not have the authority to make substantive economic changes to the agreement.

14. Eric emailed the parties on June 19, 2007 to propose changing the wording of the Sale Proceeds Waterfall's third paragraph from "each Member" (referring to Scion and ASB) to "the Fund" (referring to ASB alone). This proposed change evidenced exactly how closely Eric read the contract. He was concerned that Scion, because it would be receiving its profits under the promote in an amount disproportionate to its equity investment, would reach its second preferred return amount before ASB (which would be receiving less than 80% of the profits) would satisfy its preferred return amount on its 99% equity investment. Eric wanted to clarify that Scion would continue receiving its promote percentages until ASB recovered its second preferred return amount on its investment. He did not address or reference the fact that the draft placed the promote ahead of the return of capital.

Unrecovered Second Preferred Return Amount has been reduced to zero; ***and***

(iv) Fourth, among the Members in proportion to the Invested Capital of the Members at such time, until such time as each Member's Invested Capital has been reduced to zero;

(v) Fifth, (x) the Remaining Percentage [65%] to the Members in proportion to their respective Percentage Interest at such time, and (y) the Promote Percentage [35%] to Venture Partner.[15]

The Vice Chancellor found through clear and convincing evidence that the parties had erroneously placed the third paragraph's distribution before the fourth's distribution. That error caused the first-tier promote to fall before the return of the members' invested capital (and leaves the "; and" out of place). Reversing the distributions in those two paragraphs would reflect the May 2007 Terms and resolve the "; and" issue. The ASB Investment Committee approved the deal based on an internal memorandum describing the Waterfall as consistent with the May 2007 Terms. Bellinger testified that he reviewed parts of the Breckenridge LLC Agreement before approving it, but he admitted that he failed to read carefully the Agreement.

The parties then entered into their fourth joint venture, the 2040 Lofts, LLC, project. Nelson drafted the agreement by electronically copying the Breckenridge LLC Agreement and making deal-specific changes. The only changes to the Sale Proceeds Waterfall were to replace the word "First" with "8%" in two places and the word "Second" with "12%" in one place.[16] Neither ASB nor Scion reviewed the Sale Proceeds Waterfall in any meaningful respect. The ASB Investment Committee again approved the Agreement based on an internal memorandum that described the Waterfall as consistent with the May 2007 Terms. In the 2040 Lofts LLC Agreement, however, the promote provision again appeared before the return of capital provision, the same error as in the Breckenridge LLC Agreement. Neither Bellinger nor Trachtenberg carefully read the 2040 Lofts LLC Agreement before approving the deal or when ASB later transferred the interest.[17]

Finally, the parties entered into their fifth joint venture, Dwight Lofts, LLC. Nelson again electronically copied the Breckenridge LLC Agreement and made deal-specific changes. She only edited the Sales Proceeds Waterfall to replace "Fund" with "Fund Member." Once again, the Dwight Lofts LLC Agreement incorrectly placed the first-tier promote ahead of the return of capital and no one at DLA Piper or ASB caught the error.

Effective March 3, 2008, ASB (on behalf of Dwight Lofts Holdings, LLC (DLH), a group of ASB's clients) and Scion amended the Agreement to modify a put provision. The amendment included a ratification provision which stated: "Except as set forth herein, the terms and provisions of the [Dwight Lofts LLC Agreement] are hereby ratified and confirmed and shall remain in full force and effect." Nothing

---

15. *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 2012 WL 1869416, at *7 (Del.Ch. May 16, 2012)(emphasis added) (citation omitted).

16. Because this was an unlevered deal, the May 2007 Terms called for lower preferred returns than the Breckenridge levered deal.

17. In May 2009, the ASB fund member in the 2040 Lofts venture transferred its interest to a wholly owned subsidiary so it could use its interest as collateral for a line of credit. Neither ASB nor Scion focused on or discussed the placement of the promote ahead of the return of capital when transferring the interest.

in the Dwight Amendment changed the Sale Proceeds Waterfall, and only Scion knew of the error at that time.

Between their fourth and fifth joint ventures, the parties entered into the Automatic Lofts deal. For tax reasons, the parties did not structure the deal as a joint venture. Instead, Scion served as the property manager and loan servicer, and the parties structured Scion's compensation so as to mimic Scion's joint venture compensation under the May 2007 Terms. Trachtenberg engaged in significant drafting and negotiation for this project. Arjomand initially explained to Rob that Scion's incentive management fee would mimic the Scion—ASB promote structure for a levered deal, but, after further negotiation, the parties agreed to use the unlevered percentages. Ultimately, the Incentive Management Agreement employed an internal rate of return formulation which necessarily required that Scion earn a promote only *after* the return of invested capital. When he reviewed the Automatic Lofts agreement, Eric accepted the placement of the return of capital before the first-tier promote without comment. The Vice Chancellor found that the Bronstein brothers accepted the IRR formulation in the Automatic Lofts deal because they knew that it was correct[18] and that the different Sale Proceeds Waterfalls in the Breckenridge and 2040 Lofts LLC Agreements were incorrect.[19]

On June 12, 2010, Scion exercised its put right in the 2040 Lofts LLC Agreement. ASB had contributed $47.3 million in capital; Scion had invested $479,000. The parties agreed the venture was underwater, with a fair market value of $35.5 million.

On August 30, 2010, Eric informed ASB that the put's purchase price was $1.83 million, including an approximately $1.5 million promote (in total representing a 282% gain for Scion and a 30% loss for ASB). Without the promote, Scion's buyout price would have been only $347,792.46. The parties would thus have shared the loss proportionately.

Arjomand had left ASB before Scion exercised the put, and James Darcey replaced him. Less than half an hour after receiving Eric's purchase price calculation, Darcey responded: "I'm confused. Does your calculation suggest that Venture Partner (Scion) is due $1.8 million? It seems odd to me that an investment into which we together invested over $47 million and which is now valued at $35.5 million would generate a promote." Eric invoked the Sales Proceeds Waterfall to defend his calculation. After receiving Eric's response, Darcey emailed Rob to ask if the 2040 Lofts venture differed from the University Crossing deal. Rob explained in an email four reasons why the economic structure differed when he responded to Darcey; at trial, however, Rob admitted virtually every statement in the email was false.

After these emails, Darcey and Bellinger examined the agreements and identified the scrivener's error. Bellinger called DLA Piper and "had a very, very tough conversation;" he was "incredibly upset that this had happened because it was clear what the document said, and that it was just wrong." ASB then put DLA Piper on notice of a malpractice claim.

On July 22, 2010, Scion exercised its put right under the Dwight Lofts LLC Agree-

---

**18.** The Vice Chancellor again made credibility judgments when assessing the Bronstein brothers' testimony.

**19.** While the Dwight Lofts LLC Agreement also contained the same error as the Breckenridge and 2040 Lofts LLC Agreements, the Automatic Lofts deal occurred before the parties began the Dwight Lofts project.

ment, claiming a $3.38 million purchase price, which included an approximately $2.6 million promote. ASB contends that Scion is due only $1.26 million. Under the LLC Agreement, ASB contributed approximately $78.5 million and Scion contributed approximately $790,000.

In a September 20, 2010 letter, ASB notified Scion that unless Scion agreed to correct the Breckenridge, 2040 Lofts, and Dwight Lofts LLC Agreements (collectively, the Disputed Agreements) by the close of business on September 21, 2010, ASB would file suit. The next day, Scion preemptively filed a lawsuit in the United States District Court for the Eastern District of Wisconsin, regarding only the 2040 Lofts venture.[20] On September 22, 2010, ASB filed suit in the Court of Chancery seeking an order reforming the Sale Proceeds Waterfalls in all three of the Disputed Agreements to comport with the May 2007 Terms. DLA Piper represented ASB in this action free of charge. Scion counterclaimed to enforce the agreements as written. Both sides invoked a contractual fee-shifting provision detailed in the discussion of attorneys' fees *infra*.

The Court of Chancery action proceeded to trial.[21] The Vice Chancellor reformed the Disputed Agreements in favor of ASB and awarded ASB over $3.2 million in attorneys' fees based on the contractual fee-shifting provisions. Scion alleges the Vice Chancellor erred because: (1) he failed to recognize that failure to read a contract bars a claim for equitable reformation; (2) he misapplied Delaware law when he granted reformation based on unilateral mistake in the absence of finding concealment, trickery, or a duty to speak; (3) he misapplied Delaware law when he ruled that a ratifying party must have actual knowledge of the mistake for ratification to bar reformation; and (4) he erroneously awarded ASB attorneys' fees because he failed to interpret the parties' contractual fee-shifting provisions consistently with the contracts' plain language.

## II.  STANDARD OF REVIEW

■ We review the Vice Chancellor's legal conclusions *de novo*,[22] but we defer to the Vice Chancellor's factual findings unless they are clearly erroneous.[23] While we review an award of attorneys' fees for abuse of discretion,[24] we review the Vice Chancellor's interpretation of a contractual fee-shifting provision *de novo*.[25]

---

**20.** On September 24, 2010, Scion filed an action concerning the Breckenridge venture in the U.S. Federal District Court for the Middle District of Florida and an action concerning the Dwight Lofts venture in the U.S. Federal District Court for the Northern District of Illinois. Defendants' Opening Brief in Support of Their Motion to Dismiss at 1–2, *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 2012 WL 1869416 (Del.Ch. May 16, 2012) (C.A. No. 5843–VCL). Scion filed the federal cases in the jurisdictions where the real estate underlying each of the agreements is located. *Id.* at 2.

**21.** The Vice Chancellor found that Scion's tactics caused four courts and the parties to engage in redundant and otherwise unnecessary activities. He noted that the parties

made at least two emergency applications to the Court of Chancery for an expedited decision to help avoid what he described as a "multi jurisdictional train wreck."

**22.** *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 170 (Del.2002)(citing *Rapid–Am. Corp. v. Harris*, 603 A.2d 796, 804 (Del.1992)).

**23.** *Cede & Co. v. Technicolor, Inc.*, 758 A.2d 485, 491 (Del.2000).

**24.** *William Penn P'ship v. Saliba*, 13 A.3d 749, 758 (Del.2011) (citing *Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245 (Del.2007)).

**25.** *Gotham Partners*, 817 A.2d at 170 (citing *Schock v. Nash*, 732 A.2d 217, 224 (Del. 1999)).

## III. ANALYSIS

### A. ASB's Alleged Negligence Does Not Bar an Equitable Reformation Claim.

■ Although the parties selectively parse the Vice Chancellor's opinion to craft their respective narratives, the Vice Chancellor's factual findings are clear and the record supports them. After considering both "Bellinger's testimony and the overall context of the negotiations," the Vice Chancellor found that "Bellinger read the University Crossing [LLC A]greement in its entirety and was familiar with its terms." [26] Concerning the Disputed Agreements, the Vice Chancellor found that "Bellinger relied on Trachtenberg and Arjomand to advise him about any changes, brief him on new terms, and provide him with any portions that he needed to read." [27] Because the University Crossing LLC Agreement formed the basis for the three Disputed Agreements, the Vice Chancellor concluded that "Bellinger adequately and properly oversaw the negotiation process and was informed about the terms of the joint venture agreements as negotiated by the parties." [28] The Vice Chancellor ruled that, even assuming Bellinger read none of the Disputed Agreements, but rather relied on his employees and advisors to inform him of any changes,

his failure to read would not bar a reformation claim.[29]

■ Scion claims that Delaware law does not support the Vice Chancellor's ruling. We recognize that our case law in this area has been unclear. In *Cerberus International, Ltd. v. Apollo Management, L.P.*, we observed that "[a]ny mistake claim by definition involves a party who has not read, or thought about, the provisions in a contract carefully enough." [30] We created some confusion by observing that "[s]ome jurisdictions do say that a degree of fault greater than negligence bars reformation," [31] but clarified that we have "never adopted such a rule" and that we took "no position on whether, under certain circumstances, a party's *misconduct* could bar a reformation claim." [32] It is unclear whether "misconduct" means simple negligence, gross negligence, or something more.[33] To resolve the confusion surrounding our use of the word "misconduct," we now adopt the standard in *Restatement (Second) of Contracts* § 157: for purposes of a reformation claim, "[a] mistaken party's fault in failing to know or discover the facts before making the contract" does not bar a reformation claim "unless his fault amounts to a failure to act in good faith and in accordance with rea-

---

**26.** *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 2012 WL 1869416, at *15 (Del.Ch. May 16, 2012).

**27.** *Id.*

**28.** *Id.*

**29.** *See id.*

**30.** *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1154 (Del.2002) (citations omitted).

**31.** *Id.* at 1154 n. 47 (citing *Foster v. Gibbons*, 177 Or.App. 45, 33 P.3d 329, 331 (2001)(forbidding reformation based on the plaintiff's

"gross negligence"); *Restatement (Second) of Contracts* § 157 (1981)(barring reformation if the fault "amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing")).

**32.** *Id.* (emphasis added).

**33.** *See* M.L. Cross, Annotation, *Negligence in Executing Contract as Affecting Right to Have It Reformed*, 81 A.L.R.2d 7 (1962) (collecting cases and describing various standards of "misconduct" that would bar reformation in different jurisdictions).

sonable standards of fair dealing."[34] To the extent existing Delaware case law is inconsistent with this standard, we expressly overrule it.[35]

■ This standard is limited to reformation claims and does not affect our existing rule in cases that a failure to read bars a party from seeking to avoid or rescind a contract.[36] Avoidance and reformation are fundamentally different remedies. Avoiding or rescinding[37] a contract essentially "results in [the] abrogation or 'unmaking' of an agreement, and attempts to return the parties to the status quo [ante]."[38] In contrast, reformation does not "unmake" an agreement; it corrects an enforceable agreement's written em-

bodiment to "reflect the parties' true agreement."[39] We adhere to our case law holding that a party cannot seek *avoidance* of a contract he never read.[40] In contrast, we will permit a party to seek *reformation* of a written agreement that incorrectly transcribes the parties' agreement, so long as the party's conduct does not amount to a failure to act in good faith and in accordance with reasonable standards of fair dealing.

■ Applying that standard, we hold that even assuming Bellinger did not read the Disputed Agreements, he acted in good faith and in accordance with reasonable standards of fair dealing.[41] The record supports the Vice Chancellor's factual

---

**34.** *Restatement (Second) of Contracts* § 157 (1981). We agree with the *Restatement*'s authors that while many jurisdictions couch the standard as one of " 'gross' negligence, that term is not well defined" and we prefer to state our conception of the rule "in terms of good faith and fair dealing." *See id.* § 157 cmt. a.

**35.** *See, e.g., Graham v. State Farm Mut. Auto. Ins. Co.*, 1989 WL 12233, at *2 (Del.Super. Jan. 26, 1989)(quoting *Standard Venetian Blind Co. v. Am. Empire Ins.*, 503 Pa. 300, 469 A.2d 563 (1983))("I am in accord with the Pennsylvania Supreme Court which held that 'failure to read a contract in the absence of fraud is an unavailing excuse or defense and cannot justify an *avoidance, modification* [,] *or nullification* of the contract or any provision thereof.' " (emphasis added)), *aff'd*, 565 A.2d 908 (Del.1989)(stating that failure to read cannot justify *avoidance* ).

**36.** *See, e.g., Pellaton v. Bank of N.Y.*, 592 A.2d 473, 477 (Del.1991) (quoting *Graham v. State Farm Mut. Auto. Ins. Co.*, 565 A.2d 908, 913 (Del.1989)("A party to a contract cannot silently accept its benefits, and then object to its perceived disadvantages, nor can a party's failure to read a contract justify its avoidance.")); *W. Willow–Bay Court, LLC v. Robino–Bay Court Plaza, LLC*, 2009 WL 3247992, at *4 n. 19 (Del.Ch. Oct. 6, 2009)(quoting 27 Williston on Contracts § 70.113 (4th ed. 2009))(" '[F]ailure to read a contract provides no defense against enforcement of its provi-

sions where the mistake sought to be avoided is unilateral and could have been deterred by the simple, prudent act of reading the contract.' "), *aff'd*, 985 A.2d 391 (Del.2009)(ORDER).

**37.** According to *Black's Law Dictionary*, "avoidance" and "rescission" are identical. *See Black's Law Dictionary* 156, 1420–21 (9th ed.2009).

**38.** *Norton v. Poplos*, 443 A.2d 1, 4 (Del.1982); *see also In re Schick*, 232 B.R. 589, 598 (Bankr.S.D.N.Y.1999) (citation omitted) ("Rescission permits a party 'to disaffirm the contract and return to the status that existed before the transaction was executed.' ").

**39.** *Schick*, 232 B.R. at 598 (citation omitted)(noting that "[r]eformation and rescission are fundamentally different remedies").

**40.** *See supra* note 36 and accompanying text.

**41.** The *Restatement* indicates that parties' conduct does not amount to a failure to act in good faith and in accordance with reasonable standards of fair dealing where (1) one party's lawyer erroneously reduced the parties' actual agreement to writing, (2) neither party read the writing before signing it, and (3) the error would have been obvious had the parties read the writing. *See Restatement (Second) of Contracts* §§ 155 cmt. a, illus. 1, 157 cmt. b, illus. 3 (1981). We do not address whether Bel-

finding that Bellinger read the University Crossing LLC Agreement and then relied on his employees and advisors to alert him to any significant changes in the later agreements. The Vice Chancellor found that Bellinger's advisors informed him about the terms of the joint venture agreements as ASB and Scion had negotiated them. The Vice Chancellor correctly concluded that we do not "require that a senior decision-maker like Bellinger read" every word of every agreement.[42] Because the record supports the Vice Chancellor's factual findings, and these findings indicate that Bellinger's actions comported with reasonable standards of fair dealing, we hold that Bellinger's failure to read the Disputed Agreements does not bar ASB from seeking to reform those agreements.

## B. The Vice Chancellor Correctly Stated the Law of Reformation Based on Unilateral Mistake

■ Scion next argues the Vice Chancellor erred when he granted reformation because "simply proving a unilateral mistake by one party with knowing silence by another is insufficient to support the extraordinary remedy of equitable reformation."[43] ASB argues that Scion failed to fairly present this argument to the Vice Chancellor and thereby waived it on appeal.[44] "We 'adhere to the well settled rule which precludes a party from attacking a judgment on a theory'" he failed to advance before the trial judge.[45] Under Supreme Court Rule 8, a party may not raise new arguments on appeal.[46]

■ Here, Scion failed to "fairly present" this argument to the Vice Chancellor because, in its posttrial briefing, Scion repeatedly cited *Cerberus International, Ltd. v. Apollo Management, L.P.* for the proposition that a party seeking reformation based on unilateral mistake "'must show that it was mistaken and that the other party knew of the mistake but remained silent.'"[47] Scion quoted *Emmert v. Prade* to argue that reformation based

---

linger would have satisfied the *Restatement* standard if he had failed to read the first agreement.

**42.** *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC,* 2012 WL 1869416, at *15 (Del.Ch. May 16, 2012)(citing *In re Walt Disney Co. Derivative Litig.,* 907 A.2d 693, 749 n. 424 (Del.Ch. 2005), *aff'd,* 906 A.2d 27 (Del.2006)).

**43.** Opening Br. 19.

**44.** Answering Br. 25–26 (citing Supr. Ct. R. 8).

**45.** *Riedel v. ICI Ams. Inc.,* 968 A.2d 17, 25 (Del.2009)(quoting *Danby v. Osteopathic Hosp. Ass'n of Del.,* 104 A.2d 903, 907–08 (Del.1954)).

**46.** *Id.* at 23–25 ("Mrs. Riedel presented significantly different theories of negligence to the trial judge and to this Court. . . . Because Mrs. Riedel did not fairly present her current theo-

ry of misfeasance to the trial judge, Supreme Court Rule 8 precludes her from arguing to us that the trial judge erred" under that theory.).

**47.** App. to Opening Br. A1562, A1563 (quoting *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.,* 794 A.2d 1141, 1151–52 (Del.2002)). Scion later argued that "it is well established that a unilateral mistake cannot alone form the basis for reformation" but that "in the case of a unilateral mistake, reformation is permitted *only if* 'the other party *knew* of the mistake but remained silent.'" *Id.* at A1577 (first emphasis added)(citing *In re Appraisal of ENSTAR Corp.,* 604 A.2d 404, 413 (Del.1992); *W. Willow–Bay Court, LLC v. Robino–Bay Court Plaza, LLC,* 2009 WL 3247992, at *3 (Del.Ch. Oct. 6, 2009)(emphasis added)); *see also id.* at A1579–80 (citing *W. Willow–Bay Court, LLC,* 2009 WL 3247992, at *3) ("Under Delaware law, the doctrine of unilateral mistake requires not only that the other party *subjectively* knows of the mistake, but also that it *intentionally/knowingly* remain silent to take advantage of it.").

on unilateral mistake occurs in "exceptional cases," but it did not elaborate on the meaning of "exceptional." [48] In light of Scion's repeated references in its posttrial briefing to *Cerberus's* standard, Scion did not fairly present its current theory that Delaware law requires "something more" to the Vice Chancellor.

■ Because Scion did not fairly present this argument to the Vice Chancellor, we may consider the issue only if the interests of justice require us to do so.[49] One factor in this analysis is whether an issue is outcome-determinative with "significant implications for future cases." [50] Scion has raised contradictory case law concerning whether reformation is avail-

able at all in a unilateral mistake case,[51] or whether reformation based on unilateral mistake is available, but only in "exceptional" cases.[52] The record is clear that Scion did not engage in any fraud or trickery that would have prevented ASB from discovering the drafting error. Because the issue of whether knowing silence is sufficient for reformation is outcome-determinative and because our case law is contradictory,[53] we will consider this issue on its merits.

■ We hold that *Cerberus* accurately states Delaware law: reformation based on unilateral mistake is available where a party can "show that it was mis-

---

**48.** *Id.* at A1562 (quoting *Emmert v. Prade,* 711 A.2d 1217, 1219 (Del.Ch.1997))(internal quotation marks omitted). Somewhat similarly, during a summary judgment hearing earlier in these proceedings, Scion argued that it did not fraudulently prevent ASB from discovering the mistake and that had Scion committed fraud or some other type of misrepresentation, those facts would be distinguishable from the facts of this case. App. to Reply Br. AR24–25.

**49.** Supr. Ct. R. 8; *Smith v. Del. State Univ.,* 47 A.3d 472, 479 (Del.2012) (citation omitted).

**50.** *Sandt v. Del. Solid Waste Auth.,* 640 A.2d 1030, 1034 (Del.1994) (citing Supr. Ct. R. 8) (holding the plaintiff met Rule 8's interest of justice exception because: "(1) the issue is outcome-determinative and may have significant implications for future cases; and (2) our consideration of the issue will promote judicial economy because it will avoid the necessity of reconsidering the applicability of sovereign immunity in the event that Wetterau or Raytheon are found liable and seek contribution from the DSWA"); *see also Blinder, Robinson & Co. v. Bruton,* 552 A.2d 466, 474 (Del.1989)("In any event, given the importance of this issue and the somewhat convoluted manner in which the Commissioner's action was ultimately affirmed, we believe 'the interests of justice' require consideration of this issue by this Court under Supreme Court Rule 8.").

**51.** Opening Br. 19 (quoting *In re Appraisal of ENSTAR Corp.,* 604 A.2d 404, 413 (Del. 1992)).

**52.** *Id.* at 19–20 (citing *Travelers Cas. & Sur. Co. v. Sequa Corp.,* 2012 WL 1931322, at *5 n. 24 (Del.Ch. May 29, 2012)).

**53.** Compare *Cerberus Int'l Ltd. v. Apollo Mgmt., L.P.,* 794 A.2d 1141, 1151 (Del.2002)(citing *Collins v. Burke,* 418 A.2d 999, 1002 (Del.1980)) ("The second [doctrine allowing reformation] is the doctrine of unilateral mistake. The party asserting this doctrine must show that it was mistaken and that the other party knew of the mistake but remained silent."), and *Collins,* 418 A.2d at 1002 (citations omitted) ("The Courts of this State have always insisted in reformation cases on a showing of mutual mistake, or in appropriate cases, unilateral mistake on plaintiff's part coupled with knowing silence on defendant's part."), with *ENSTAR,* 604 A.2d at 413 (citations omitted) ("ENSTAR's unilateral mistake should have resulted in rescission. A unilateral mistake cannot be a basis for reforming a contract."), and *Burris v. Wilmington Trust Co.,* 301 A.2d 277, 279 (Del.1972) (citations omitted) ("It is well established that mutual mistake or unilateral mistake accompanied by fraud is needed to support a bill for reformation.").

taken and that the other party knew of the mistake but remained silent."[54] To the extent our cases state otherwise or impose additional requirements, we expressly overrule them.[55] Therefore, while Scion did not fairly present this argument to the Vice Chancellor, we hold that the Vice Chancellor properly relied on *Cerberus*.[56]

■ We also address the existing line of Court of Chancery cases permitting reformation based on unilateral mistake only in "exceptional" cases.[57] The parties agree that this line of cases originated with a Vice Chancellor's statement in *AOC Limited Partnership v. Horsham Corp.* that he "may reform a contract only when the contract does not represent the intent of the parties due to fraud, mutual mistake or, in *exceptional* cases, a unilateral mistake coupled with the other party's knowing silence."[58] However, it appears that this articulation misstates our language in *Collins v. Burke* that we "have always insisted in reformation cases on a showing of mutual mistake or, in *appropriate* cases, unilateral mistake on plaintiff's part coupled with knowing silence on defendant's part."[59] We expressly overrule any deci-

sions requiring that a case be "exceptional," and clarify that what makes a case "appropriate" for reformation based on unilateral mistake is the ability to show, by clear and convincing evidence, that despite the existing written agreement one party maintains is accurate, that existing writing erroneously expresses the parties' true agreement.

## C. Ratification of a Contract Properly Subject to Reformation Does Not Bar Reformation Absent Actual Knowledge of the Mistake.

■ Scion argues that the Vice Chancellor charted "a new direction in the law unsupported by Delaware precedent"[60] when he held that "[r]ather than imputed or constructive knowledge, ratification of a contract subject to reformation requires actual knowledge of the error."[61] We reject this argument and hold that the Vice Chancellor accurately stated Delaware law.

■ The Vice Chancellor appropriately noted that "[r]atification requires '[k]nowledge, actual or imputed, of all ma-

**54.** *Cerberus*, 794 A.2d at 1151 (citing *Collins*, 418 A.2d at 1002). Of course, the party seeking reformation must also "show by clear and convincing evidence that the parties came to a specific prior understanding that differed materially from the written agreement." *Id.* at 1151–52 (citing *Hob Tea Room, Inc. v. Miller*, 89 A.2d 851, 857 (Del.1952)).

**55.** *See, e.g., ENSTAR*, 604 A.2d at 413 (citations omitted) (stating that reformation is not available based on unilateral mistake); *Burris*, 301 A.2d at 279 (requiring a showing of fraud in the case of unilateral mistake).

**56.** *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 2012 WL 1869416, at * 13 (Del.Ch. May 16, 2012) (quoting *Cerberus*, 794 A.2d at 1151).

**57.** *See, e.g., Travelers*, 2012 WL 1931322, at *5 n. 24 (quoting *James River–Pennington Inc. v.*

*CRSS Capital, Inc.*, 1995 WL 106554, at *7 (Del.Ch. Mar. 6, 1995))(" 'Reformation is appropriate only when the contract does not represent the parties' intent because of fraud, mutual mistake or, in exceptional cases, a unilateral mistake coupled with the other parties' knowing silence.' ").

**58.** *AOC Ltd. P'ship v. Horsham Corp.*, 1992 WL 136474, at *7 (Del.Ch. June 17, 1992)(emphasis added)(citing *Collins*, 418 A.2d at 1002; Opening Br. 20 n. 13; Answering Br. 28.

**59.** *Collins*, 418 A.2d at 1002 (emphasis added) (citations omitted).

**60.** Opening Br. 25.

**61.** *ASB Allegiance*, 2012 WL 1869416, at *17 (citing *Fitzgerald v. Cantor*, 1998 WL 781188, at *2 (Del.Ch. Oct. 28, 1998)).

terial facts' and that knowledge 'may be implied from conduct, as well as expressed by words.'"[62] He also correctly concluded that ratification of a document subject to reformation requires actual knowledge of the mistake. As we commented in *Cerberus*, a party seeking reformation by definition admits that had he read the document more carefully, he would have noticed and corrected the mistake.[63] The Vice Chancellor reasoned that requiring actual knowledge "recognizes that a party otherwise entitled to equitable reformation based on mistake nearly always could have discovered the erroneous provision."[64] The problem in these cases arises because "[t]he mistaken party unwittingly believes, however, that the provision is accurate. That is the point of the mistake. Accordingly, ratification does not preclude reformation unless the ratifying party actually knew of the error."[65]

Several Court of Chancery decisions recognize this distinction. In one, a decision granted a motion to amend a pleading to add reformation claims because nothing in the record allowed an inference that "the circumstances that allegedly constituted ... unilateral mistake with ... knowing silence were different by the time of ratification or reaffirmation," and because equity does not sanction "[r]atification or reaffirmation based upon a continuing fraud or misapprehension about the facts."[66] Similarly, in *Great–West Investors LP v. Thomas H. Lee Partners, L.P.*, a different member of that court applied an actual knowledge standard when he stated that "[p]roof that ... Great–West *knew*" of the error when it executed a contract in 2008 "might indicate that Great–West had waived its claims that the [contract] should be reformed based on a 2007 mistaken interpretation of that language."[67]

We also note that other courts apply a similar distinction. A Southern District of New York bankruptcy judge, interpreting New York law, noted that "[r]atification

62. *Id.* at *16 (quoting *Frank v. Wilson & Co.*, 32 A.2d 277, 283 (Del.1943)).

63. *See Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1154 (Del.2002) (citations omitted).

64. *ASB Allegiance*, 2012 WL 1869416, at *17.

65. *Id.*

66. *Fitzgerald*, 1998 WL 781188, at *2.

67. *Great–W. Investors LP v. Thomas Lee Partners, L.P.*, 2011 WL 284992, at *12 (Del.Ch. Jan. 14, 2011) (emphasis added) (citing *Restatement (Second) of Contracts* § 380(2) (1981)). To the extent one could read that Vice Chancellor's language later in the opinion as imposing a constructive knowledge standard, we expressly reject that language. *See id.* ("[T]he Court must accept, for purposes of the pending motion to dismiss, that Great–West had *no reason to know* of its mistake in August 2008 and did not waive its mistake claims by executing the [contract] at that time." (emphasis added)).

In *Great–West Investors*, that Vice Chancellor relied on *Restatement (Second) of Contracts* § 380(2) to determine whether ratification can bar reformation. *Id.* (citation omitted). We note that Section 380 refers to the "power of a party to *avoid* a contract for mistake or misrepresentation ... if ... he knows or has reason to know of the mistake." *Restatement (Second) of Contracts* § 380(2) (1981). As earlier discussed, there is a significant conceptual distinction between avoidance and reformation. *See supra* notes 36–39 and accompanying text. Similarly, Scion cites a Pennsylvania Supreme Court case for the proposition that "a party who ratifies a contract without reading it should be held to the terms of that contract." *See* Opening Br. 26 (citing *O'Reilly v. Reading Trust Co.*, 262 Pa. 337, 105 A. 542, 544–45 (1918)). We distinguish that case based on the conceptual difference between avoidance and reformation. *See O'Reilly*, 105 A. at 544 (The parties "now come into a court of equity and ask a chancellor to decree that both of these agreements shall be declared *null and void*." (emphasis added)).

does not appear to apply to reformation. Ratification involves the loss of the power to avoid an otherwise voidable contract by taking acts inconsistent with disaffirmance. An agreement subject to reformation is not voidable, and cannot be disaffirmed." [68] In Louisiana, where "[r]atification requires not only knowledge of the terms of the act involved, but also an express intention to be bound thereby with full knowledge of the facts and recitations contained therein," the Louisiana Court of Appeals barred a defendant in a reformation action from asserting a ratification defense.[69] There, the Louisiana court found "not one scintilla of evidence which even remotely suggests [the plaintiff] intended to ratify the" alleged error supporting the reformation claim.[70] Similarly, at least four other states agree that "in order to make a ratification effective the party must have ratified the instrument as it was and not as the party thought it was." [71]

■ Scion does not appeal the Vice Chancellor's factual finding that ASB's

client group, DLH, had no knowledge of the error in the Dwight Lofts LLC Agreement when it signed the Dwight Amendment. Because DLH had no actual knowledge of the error at the time it purportedly ratified the mistake, we affirm the Vice Chancellor's judgment reforming the agreement in favor of DLH.

### D. ASB Is Not Entitled to Attorneys' Fees and Costs Under the Contract.

The Vice Chancellor awarded ASB attorneys' fees and costs based on "the contractual fee-shifting provisions in the Disputed Agreements." [72] Scion argues the Vice Chancellor erroneously awarded fees based on the contractual provision because ASB never "incurred" fees for which Scion should "reimburse" it and because ASB was not a "prevailing party" in an "action to enforce the contract." [73] ASB argues that the Vice Chancellor properly awarded fees under the contract, but if we hold otherwise, we should remand the case so the Vice Chancellor can consider ASB's

**68.** *In re Schick*, 232 B.R. 589, 599 n. 11 (Bankr.S.D.N.Y.1999) (citations omitted).

**69.** *Cockerham v. Aime*, 110 So.2d 238, 246 (La.Ct.App.1959).

**70.** *Id.*

**71.** 76 C.J.S. *Reformation of Instruments* § 62 (2013) (citing *Jones v. Jones*, 27 Ark.App. 297, 770 S.W.2d 174 (1989); *Cook–Reynolds Co. v. Beyer*, 107 Mont. 1, 79 P.2d 658 (1938); *Franciscan Hotel Co. v. Albuquerque Hotel Co.*, 37 N.M. 456, 24 P.2d 718 (1933); *Merriam v. Nat'l Life & Accident Ins. Co.*, 169 Tenn. 291, 86 S.W.2d 566 (1935)); *see also* 66 Am.Jur.2d *Reformation of Instruments* § 73 (2013) (citing *Goodman Realty, Inc. v. Monson*, 267 Mont. 228, 883 P.2d 121 (1994); *Krueger v. Morris*, 110 Mont. 559, 107 P.2d 142 (1940)) ("Where a party acquiesces in an instrument *after becoming aware of the mistake*, he or she loses his or her right to reformation.... [T]here can be no acquiescence unless the party knows of the error in the instrument or

the circumstances are such that he or she will be presumed to know of it." (emphasis added)). The Arizona Supreme Court impliedly requires actual knowledge for ratification to bar reformation. *See Home Owners' Loan Corp. v. Bank of Ariz.*, 54 Ariz. 146, 94 P.2d 437, 441 (1939)("The parties *after the discovery of the mistake* had the power and right, if they so chose, to ratify it so as to preclude them from asking a court of equity to correct it." (emphasis added)). The Utah Supreme Court also requires actual knowledge. *See George v. Fritsch Loan & Trust Co.*, 69 Utah 460, 256 P. 400, 404 (1927) (citations omitted) ("The general rule is that relief in the way of reform of a written instrument should not be granted when the party seeking it has acquiesced in the written agreement *after being aware of the mistake*." (emphasis added)).

**72.** *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 2012 WL 1869416, at *20 (Del.Ch. May 16, 2012)

**73.** Opening Br. 28, 30–31 (citations omitted).

alternative argument that it is entitled to fees under 10 *Del. C.* § 5106.[74]

We hold that ASB did not "incur" fees requiring reimbursement within the plain meaning of the contract and therefore reverse the Vice Chancellor's fee award on that basis.[75] We remand for the Vice Chancellor to consider whether a fee award would be appropriate in this case because it meets the terms of one of the limited exceptions to the general rule that a party pays his own fees. We clarify that the Vice Chancellor's power to award fees stems from his inherent equitable authority, not from the statutory power to award costs under 10 *Del. C.* § 5106.

### 1. The Contractual Fee Award

■ The Disputed Agreements contain the following fee-shifting provision: where " 'any of the parties to this Agreement undertakes any action to enforce the provisions of this Agreement against any other party, the non-prevailing party shall reimburse the prevailing party for all reasonable costs and expenses incurred in connection with such enforcement, including reasonable attorneys' fees.' "[76] We interpret clear and unambiguous contract terms according to their plain meaning.[77] The plain meaning of "incurred," combined

with "reimburse," does not extend to this situation where ASB did not incur any payment obligation because DLA Piper agreed to represent it without charge.

*Black's Law Dictionary* defines "incur" as "[t]o suffer or bring on oneself (a liability or expense)."[78] "[R]eimburse" means to repay or indemnify.[79] ASB did not suffer or bring upon itself a liability or an expense. Similarly, ASB made no payment for which it needed to be repaid or indemnified.

One Court of Chancery decision, *O'Brien v. IAC/Interactive Corp.*, interprets a merger agreement's indemnification provision to determine whether a contingent fee agreement with a success premium fell within the meaning of "incurred."[80] The Vice Chancellor in that case ruled that the plaintiff seeking fees "actually incurred the full [amount] because he was obliged to pay that amount to" his attorneys.[81] He explained that if the defendant succeeded on appeal, the plaintiff would have to return the money the defendant had already advanced because he would not owe his attorneys, and therefore he would not have incurred those fees.[82]

---

**74.** Answering Br. 31.

**75.** Accordingly, we do not address the arguments that ASB was not a "prevailing party" or that an action for reformation is not "an action to enforce the contract."

**76.** *ASB Allegiance,* 2012 WL 1869416, at *20 (quoting JX 82 § 9.9).

**77.** *Riverbend Cmty., LLC v. Green Stone Eng'g, LLC,* 55 A.3d 330, 335 (Del.2012)(quoting *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.,* 36 A.3d 776, 780 (Del.2012)); *see also City Investing Co. Liquidating Trust v. Cont'l Cas. Co.,* 624 A.2d 1191, 1198 (Del.1993)(citing *Citadel Holding Corp. v. Roven,* 603 A.2d 818, 822 (Del.1992))("If a writ-

ing is plain and clear on its face, *i.e.,* its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent.").

**78.** *Black's Law Dictionary* 836 (9th ed.2009).

**79.** *Id.* at 1399 (defining "reimburse" as the verb form of "reimbursement," defined as repayment or indemnification).

**80.** *O'Brien v. IAC/Interactive Corp.,* 2010 WL 3385798 (Del.Ch. Aug. 27, 2010), *aff'd,* 26 A.3d 174 (Del.2011).

**81.** *Id.* at *7.

**82.** *Id.*

Similarly, a Colorado federal district court judge addressed contractual fee award language in both a legal services agreement and promissory notes where the claimant's counsel "provided their services *pro bono* in the post-settlement litigation regarding enforcement of the attorney's liens." [83] Interpreting the plain meaning of "incur" in the legal services agreement,[84] the judge held that the claimant "did not 'incur' any costs or expenses," despite the claimant's argument that " 'incur' does not mean the same as 'pay' and the mere fact that counsel did not bill does not mean that [the claimant] did not incur those fees." [85] After defining "incur," the judge noted that the claimant "owe[d] no debt and ha[d] no liability for any fees;" [86] therefore, "[u]nder the plain and ordinary meaning of the words presented, [the claimant] did not *personally* incur any costs or expenses, and, hence, did not trigger recovery under the attorneys' fees provision." [87]

The Colorado federal judge also considered the meaning of the term "reimburse" in the context of the promissory notes at issue in that case:

The use of the word "reimburse" contemplates an actual payment by the holder, which will then be repaid by the maker. The phrasing "pay or reimburse the holder for all reasonable expenses ... incurred" again strongly indicates that the maker's obligation to pay is triggered by expenses incurred by the [h]older, not some other party or a *pro bono* attorney.[88]

■ We find the Colorado federal judge's analysis in this case persuasive. "Reimburse" and "incur" clearly and unambiguously indicate that ASB must have been liable for a payment at some point.[89] ASB argues that we should award fees in order to encourage law firms to do "the right thing." [90] We disagree. We are not inclined as a policy matter to award fees to ASB, who would pass them presumably on

---

**83.** *Deitz v. Univ. of Denver*, 2011 WL 2559829, at *3 (D.Colo. June 28, 2011).

**84.** The agreement read: " 'If I incur any costs or expenses in collecting any amounts due, you agree to pay such costs and expenses, including reasonable attorneys' fees.' " *Id.* at *4 (citation omitted).

**85.** *Id.*

**86.** *Id.* (citing *Black's Law Dictionary* 836 (9th ed.2009)).

**87.** *Id. But see Cintas Corp. v. Perry*, 517 F.3d 459, 468–69 (7th Cir.2008)(interpreting an employment agreement under Ohio law and holding that the "fee-shifting provision's use of the word 'incurred' does not mean that [the employee] himself must pay the litigation costs and attorney's fees before being entitled to an award of costs and fees," and construing the provision against the employer as the drafter to the extent there was any ambiguity, where the former employee's new employer, while not obligated to do so, paid the employee's attorneys' fees.). We distinguish *Cintas* because of the nature of the litigation (employer—employee contractual dispute over a noncompetition provision), the fact that the law firm actually billed the employee—defendant but his new employer paid the bills, and because the court construed the contract against the employer—drafter to the extent the meaning of "incurred" was ambiguous. *Id.*

**88.** *Deitz*, 2011 WL 2559829, at *5 (omission in original).

**89.** We distinguish this case from scenarios where public policy or other considerations might control, for example, in the case of fee awards based on statutory provisions where public policy might color the meaning of "incurred" to encompass pro bono representation, actions taken by in-house counsel who do not incur fees in the traditional sense, or indemnification arrangements.

**90.** Answering Br. 35.

to DLA Piper.[91] That would effectively reward DLA Piper for successfully litigating this reformation action to correct its own mistakes.

### 2. Fee Award Based on 10 Del. C. § 5106

Because we hold ASB is not entitled to fees under the Disputed Agreements' contractual provisions, ASB asks us to remand so that the Vice Chancellor can consider a fee award under 10 Del. C. § 5106.[92] Although we cannot remand for the Vice Chancellor to consider a fee award under the statute, we note that when ASB raised this issue, it relied on cases that improperly conflate a Vice Chancellor's inherent equitable power to award fees in a proper case with the statutory authority to award costs 10 Del. C. § 5106 provides. Therefore, although we clarify that a party cannot seek attorneys' fees under 10 Del. C. § 5106, we interpret ASB's request as one encompassing the argument that the Vice Chancellor consider a fee award under his inherent equitable powers.

Section 5106 provides that "[t]he Court of Chancery shall make such order concerning costs in every case as is agreeable to equity."[93] "Costs" in this context is a term of art that does not include attorneys' fees. Any contrary precedent, we expressly overrule.[94] We have made

91. There is no evidence that ASB is even required to pass those fees along to its lawyers; the lawyers agreed to represent ASB without charge. In the event ASB did not pass on a fee award, the award would be a windfall to ASB.

92. ASB properly presented this argument to the Vice Chancellor. See Plaintiffs' Opening Posttrial Brief on Reformation at 44, 48 (citing Kerns v. Dukes, 707 A.2d 363, 369 (Del. 1998); Shepherd v. Mazzetti, 545 A.2d 621, 624 (Del.1988); Wilmington Med. Ctr., Inc. v. Severns, 433 A.2d 1047, 1049–50 (Del.1981)), ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC, 2012 WL 1869416 (Del.Ch. May 16, 2012) (C.A. No. 5843–VCL). The Vice Chancellor did not reach this argument because he awarded fees based on the contractual provisions of the Disputed Agreements. See ASB Allegiance, 2012 WL 1869416, at *20.

93. 10 Del. C. § 5106.

94. See, e.g., Kerns, 707 A.2d at 369 (citing Wilmington Trust Co. v. Coulter, 208 A.2d 677, 681–82 (Del.Ch.1965)) ("With respect to attorneys' fees, the Court of Chancery may award attorneys' fees as costs pursuant to 10 Del. C. § 5106 and Court of Chancery Rule 54(d), where, in its discretion, the equities so dictate."); Shepherd, 545 A.2d at 624 (citations omitted) ("Although, as a general rule, equity will grant 'ordinary court costs' to the prevailing party in every case 'as is agreeable to equity,' and 'ordinary court costs' do not usually include a party's counsel fees, the grant or denial of counsel fees lies within the sound discretion of the Chancellor."); Severns, 433 A.2d at 1049–50 (citations omitted) ("The statutory reference to costs includes counsel fees, where equity requires."); Perrine v. Pennroad Corp., 64 A.2d 412, 415 (Del.1948)(interpreting "paragraph 4907 of the Code of 1935, which contains the following provision, 'A Court of Equity, * * * shall make such order concerning costs in every case as shall be agreeable to equity,' " to conclude that in "a case like the one before us, it means that every one engaged in the litigation who was in any way helpful in the proceedings which culminated in the settlement agreement, or who assisted in securing the approval of said agreement by the Court in order that stockholders might ultimately receive the benefit thereof, should be paid what their services are reasonably worth"); RGC Int'l Investors, LDC v. Greka Energy Corp., 2001 WL 984689, at *19 (Del.Ch. Aug. 22, 2001) (citations omitted); Cantor Fitzgerald L.P. v. Cantor, 2000 WL 307370, at *31 (Del.Ch. Mar. 13, 2000) (citing 10 Del. C. § 5106) (referring to the power of a Vice Chancellor to "award fees where equity so provides"); In re The Charles Wm. Smith Trust, 1999 WL 596274, at *2 (Del.Ch. July 23, 1999) (citations omitted); Everett v. Lanouette, 1994 WL 681106, at *10 (Del.Ch. Nov. 10, 1994) (citations omitted); Univ. of Del. v. Warrington, 1993 WL 410417, at *1

clear that costs "do not generally include a party's counsel fees."[95] Similarly, we draw a distinction between attorneys' fees and costs when determining a judgment's finality: we have consistently held that a judgment is not final until attorneys' fees are awarded, but a judgment is final where only costs remain to be awarded.[96]

In 1955, a Delaware trial judge "held that the word 'costs', as used in ... 10 Del C. § 5106, may not be construed to include counsel fees of the proponent"[97] because to hold otherwise would cause an "irreconcilable conflict"[98] with our statement in *Great American Indemnity Co. v. State* that "[i]t is settled that a court may not order the payment of attorneys' fees as a part of the costs to be paid by the losing party unless the payment of such fees is specifically authorized by statute or contract."[99] As the trial judge noted, "by common usage and ordinary meaning, the word 'costs' does not include counsel fees of a successful litigant and ... there appears to be no acceptable reason for according to the word any meaning broader than that ordinarily given it."[100] Similarly, in a recent 2005 opinion, a Vice Chancellor noted that "the term 'costs' is routinely limited to court costs and certain other expenses necessarily incurred in the litigation process, but excluding legal fees."[101]

■ "It is beyond dispute that litigants in Delaware are generally responsible for paying their own counsel fees," absent special circumstances or a contractual or statutory right to receive fees.[102] It is also well established that a Chancellor or Vice Chancellor, "under his equitable powers, has latitude to shift attorneys' fees."[103] Circumstances where a Vice

(Del.Ch. Oct. 6, 1993) (citations omitted); *Bruce v. Bruce*, 1977 WL 9550, at * 1 (Del.Ch. June 28, 1977) (citations omitted).

95. *CM & M Grp., Inc. v. Carroll*, 453 A.2d 788, 795 (Del.1982) (citations omitted) (noting that under 10 *Del. C.* § 5106 "[a]s a general rule, equity will grant ordinary court costs to the prevailing party in every case 'as is agreeable to equity,' " but that " '[o]rdinary court costs,' however, do not generally include a party's counsel fees"). *But see Perrine v. Pennroad Corp.*, 64 A.2d 412, 415 (Del.1948)(interpreting "paragraph 4907 of the Code of 1935, which contains the following provision, 'A Court of Equity, * * * shall make such order concerning costs in every case as shall be agreeable to equity' " to conclude "that every one engaged in the litigation who was in any way helpful in the proceedings ... should be paid what their services are reasonably worth").

96. *Emerald Partners v. Berlin*, 811 A.2d 788, 790–791 (Del.2001); *Lipson v. Lipson*, 799 A.2d 345, 348 (Del.2001).

97. *In re Last Will & Testament of Dougherty*, 114 A.2d 661, 662–63 (Del. Orphans' Ct.1955).

98. *Id.* at 662 (citations omitted).

99. *Id.* (citing *Great Am. Indem. Co. v. State*, 88 A.2d 426, 428 (Del.1952)("It is the general rule that a court may not order the payment of attorneys' fees as a part of the costs to be paid by the losing party unless the payment of such fees is authorized by some provision of a statute or of the bond sued upon.")).

100. *Id.*

101. *Cove on Herring Creek Homeowners' Ass'n v. Riggs*, 2005 WL 1252399, at *2 (Del.Ch. May 19, 2005) (citing 10 *Del. C.* § 5106; *Dobler v. Montgomery Cellular Holding Co.*, 2002 WL 31112195 (Del.Ch. Aug. 29, 2002)).

102. *Burge v. Fidelity Bond & Mortg. Co.*, 648 A.2d 414, 421 (Del.1994)(citing *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1164 (Del.1989)); *Barrows v. Bowen*, 1994 WL 514868, at *1 (Del.Ch. Sept. 7, 1994)("[U]nder the prevailing 'American Rule,' courts generally do not award attorney's fees to a prevailing party unless some special circumstance is present.").

103. *Gatz Props., LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1222 (Del.2012); *Maurer v.*

Chancellor may use his equitable powers to award fees outside of an express "statutory authorization" [104] or a contractual fee-shifting provision include, but are not limited to: (1) the presence of a "common fund created for the benefit of others;" [105] (2) where the judge concludes a litigant brought a case in bad faith or through his bad faith conduct increased the litigation's cost; [106] and (3) cases in which, although a defendant did not misuse the "litigation process in any way, ... the action giving rise to the suit involved bad faith, fraud, 'conduct that was totally unjustified, or the like' and attorney's fees are considered an appropriate part of damages." [107] More generally, a Vice Chancellor may award fees in the limited "circumstances of an individual case [that] mandate that the court, in its discretion, assess counsel fees 'where equity requires.' " [108] Because this power is inherently equitable, even a Superior Court judge in a case sounding in equity may award fees absent contractual or statutory authority.[109] This inherent equitable authority to award fees does not arise from the statutory power to award "costs" under 10 *Del. C.* § 5106, however.

■ Some decisions improperly conflate the Court of Chancery's inherent equitable power to award fees in a proper case with the statutory authority to award costs where the equities dictate under 10 *Del. C.* § 5106.[110] As one Court of Chancery decision has noted, the cases that have treated attorneys' fees "as coming within 10 *Del. C.* § 5106" are simply "a restatement of the existing equity rule." [111] Although that court cannot award fees as "costs" under Section 5106, the question remains whether ASB is entitled to fees, as an exercise of the Vice Chancellor's

*Int'l Re–Ins. Corp.*, 95 A.2d 827, 830 (Del. 1953) ("The power of the Chancellor to allow counsel fees from such a fund or property, in certain cases and in the exercise of a sound discretion, is well-settled."); *see also Dickerson v. Castle*, 1992 WL 205796, at *1 (Del.Ch. Aug. 21, 1992)(citing *Dickerson v. Castle*, C.A. No. 10256, at 13–14, 1991 WL 208467 (Del. Ch. Oct. 15, 1991))("In an earlier decision, I concluded that under its inherent equitable powers this Court should award reasonable attorneys' fees to plaintiffs' counsel...."); *Loretto Literary & Benevolent Inst. v. Blue Diamond Coal Co.*, 444 A.2d 256, 260 (Del.Ch. 1982) ("I find that the circumstances and defendants' conduct have been such as to move this Court's discretion to exercise its inherent power to award attorneys' fees in this case.")

104. *Barrows*, 1994 WL 514868, at *1 (citations omitted)(using the federal Fair Housing Act and the federal Copyright Act as examples).

105. *Id.*

106. *Id.* (citations omitted).

107. *Id.* (citations omitted).

108. *Burge v. Fidelity Bond & Mortg. Co.*, 648 A.2d 414, 421 (Del.1994) (citations omitted).

109. *Id.* at 421–22 ("Whereas the exception has been most often applied in the Court of Chancery, it has equal viability in any situation in which a court is obliged to apply equitable principles."); *see also Dover Historical Soc'y, Inc. v. City of Dover Planning Comm'n*, 902 A.2d 1084, 1090 (Del.2006)(citing *Burge*, 648 A.2d at 421–22)(noting that where a Superior Court judge hears a case sounding in equity, the judge "has jurisdiction to award attorneys' fees even if no contract or statute requires it").

110. *See, e.g., Shepherd v. Mazzetti*, 545 A.2d 621, 624 (Del.1988) (citations omitted)(noting that "as a general rule equity will grant 'ordinary court costs' to the prevailing party in every case 'as is agreeable to equity,' " relying on 10 *Del. C.* § 5106, and that " 'ordinary court costs' do not usually include a party's counsel fees," but nevertheless concluding that "the grant or denial of counsel fees lies within the sound discretion of the Chancellor").

111. *Wilmington Trust Co. v. Coulter*, 208 A.2d 677, 681 (Del.Ch.1965) (citations omitted).

inherent equitable powers, based on one of the limited exceptions to the general rule that each party pays his own fees.[112] We remand the case to the Vice Chancellor to consider that question.

### E. Attorneys' Fees on Appeal

■ In its Answering Brief, ASB makes an informal application for an award of attorneys' fees for this appeal.[113] "Although we have authority under Supreme Court Rule 20(f) to award attorneys' fees in the case of a *frivolous* appeal, we will not consider an informal request in the absence of a formal motion made and presented in accordance with the Supreme Court Rules."[114]

### IV. CONCLUSION

For these reasons, we AFFIRM the Court of Chancery's judgment in part, REVERSE in part, and REMAND for further proceedings consistent with this opinion.

---

112. *See supra* notes 105–07 and accompanying text.

113. Answering Br. 35 ("The Funds also request an award of their reasonable attorneys' fees on appeal.").

114. *Gatz Props., LLC v. Auriga Capital Corp.,* 59 A.3d 1206, 1222 n. 96 (Del.2012) (emphasis added) (citing Supr. Ct. R. 20(f)); *see also Gatz Props., LLC v. Auriga Capital Corp. (Gatz II)*, 59 A.3d 1223, 1223 (Del.2012) (ORDER)

(citing *Leighton v. Beatrice Cos.,* 533 A.2d 1254, 1987 WL 4630 (Del. Oct. 16, 1987) (ORDER) (awarding attorneys' fees after appeal was dismissed for appellant's lack of standing)). If an award of fees requires findings of fact better addressed by the Vice Chancellor, we have in the past denied a motion for an award of fees without prejudice to the party's right to pursue the claim for attorneys' fees on appeal before the Vice Chancellor. *See Gatz II*, 59 A.3d at 1223.