# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CHARLES ALMOND AS TRUSTEE
FOR THE ALMOND FAMILY 2001
TRUST, ALMOND INVESTMENT
FUND LLC, CHARLES ALMOND, and
ANDREW FRANKLIN,

       Plaintiffs,

    v.

GLENHILL ADVISORS LLC,
GLENHILL CAPITAL LP, GLENHILL
CAPITAL MANAGEMENT LLC,
GLENHILL CONCENTRATED LONG
MASTER FUND LLC, GLENHILL
SPECIAL OPPORTUNITIES MASTER
FUND LLC, JOHN EDELMAN,
GLENN KREVLIN, JOHN MCPHEE,
WILLIAM SWEEDLER,WINDSONG
DB DWR II, LLC, WINDSONG DWR,
LLC, WINDSONG BRANDS, LLC,
HERMAN MILLER, INC. and HM
CATALYST, INC.,

       Defendants,

    and

DESIGN WITHIN REACH, INC.,

       Intervenor and
       Counterclaim-Petitioner.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 10477-CB

## MEMORANDUM OPINION

Date Submitted: January 9, 2019
Date Decided: April 10, 2019

Peter B. Ladig and Sara E. Bussiere of BAYARD, P.A., Wilmington, Delaware; David H. Wollmuth and Michael C. Ledley of WOLLMUTH MAHER & DEUTSCH LLP, New York, New York. *Attorneys for Plaintiffs Charles Almond as Trustee for the Almond Family 2001 Trust, Almond Investment Fund LLC, and Charles Almond.*

David A. Jenkins of SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware; Scott J. Watnik of WILK AUSLANDER LLP, New York, New York; Thomas A. Brown of MOREA SCHWARTZ BRADHAM FRIEDMAN & BROWN LLP, New York, New York. *Attorneys for Plaintiff Andrew Franklin.*

Andrew D. Cordo and F. Troupe Mickler IV of ASHBY & GEDDES, Wilmington, Delaware; Adrienne M. Ward and Brian Katz of OLSHAN FROME WOLOSKY LLP, New York, New York; John B. Horgan of ELLENOFF GROSSMAN & SCHOLE LLP, New York, New York. *Attorneys for Glenhill Advisors LLC, Glenhill Capital LP, Glenhill Capital Management LLC, Glenhill Concentrated Long Master Fund LLC, Glenhill Special Opportunities Master Fund LLC, Glenn Krevlin, William Sweedler, Windsong DB DWR II, LLC, and Windsong DWR LLC.*

Douglas D. Herrmann of PEPPER HAMILTON LLP, Wilmington, Delaware; Paul B. Carberry, Joshua Weedman, and Erin Smith of WHITE & CASE LLP, New York, New York. *Attorneys for John Edelman and John McPhee.*

Frederick B. Rosner, Scott J. Leonhardt, and Jason A. Gibson of THE ROSNER LAW GROUP LLC, Wilmington, Delaware; S. Preston Ricardo of Golenbock Eiseman Assor Bell & Peskoe LLP, New York, New York. *Attorneys for Windsong Brands, LLC.*

John D. Hendershot, Susan M. Hannigan, and Brian F. Morris of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Bryan B. House of FOLEY & LARDNER LLP, Milwaukee, Wisconsin. *Attorneys for Defendants, Counterclaim Petitioners Herman Miller Inc. and HM Catalyst, and Intervenor and Counterclaim Petitioner Design Within Reach, Inc.*

**BOUCHARD, C.**

In August 2018, the court issued a post-trial decision and entered judgment in favor of defendants and against two stockholder plaintiffs on all claims that were tried in this action arising out of Herman Miller, Inc.'s acquisition of Design Within Reach, Inc. ("DWR" or the "Company") in a transaction that involved a short-form merger. Despite losing on all claims, plaintiffs filed a motion after trial for an award of attorneys' fees and expenses in the amount of $1.5 million.

The crux of plaintiffs' motion is that they should be rewarded for conferring a corporate benefit on DWR and Herman Miller by identifying certain defective corporate acts that the court judicially validated after trial under 8 *Del. C.* § 205. Herman Miller made the request for judicial validation in a counterclaim it filed after learning about the defective corporate acts that plaintiffs had discovered in this case. The court's validation of those and other defective corporate acts that Herman Miller discovered in investigating the matter removed a cloud over the validity of the merger.

The odd aspect of plaintiffs' application is that they seek to be rewarded for "conferring" a benefit that they fought to prevent throughout this litigation. Rather than work constructively with defendants to correct what should have been obvious to plaintiffs to be a series of technical mistakes, plaintiffs chose a path of opposition. Plaintiffs opposed Herman Miller's motion for summary judgment on its counterclaim, opposed at trial judicial validation of certain of the defective corporate

1

acts for the evident purpose of attempting to procure a windfall for themselves, and even now hold open the prospect that they may seek to set aside the court's validation ruling on appeal.

Given these unusual circumstances, and for other reasons explained below, the court concludes that even though plaintiffs have made a *prima facie* showing to support a fee award under the corporate benefit doctrine, it would be inequitable to grant their fee application. Accordingly, the application will be denied.

## I. BACKGROUND

The background of this action is described extensively in the post-trial decision issued on August 17, 2018 (the "Opinion").[1] This decision recites only those facts directly relevant to plaintiffs' fee application.[2]

Plaintiffs are two former stockholders of the Company. In December 2014, plaintiffs filed this action against DWR's controlling stockholder—a group of investment funds known as Glenhill—and the directors of DWR who approved Herman Miller's acquisition of the Company, which closed in July 2014. In simplified terms, the transaction was structured so that Herman Miller would acquire over 90% of the Company's shares in a stock purchase and a share exchange, and then acquire the remainder of the shares in a short-form merger effectuated under 8

---

[1] *See Almond v. Glenhill Advisors LLC*, 2018 WL 3954733 (Del. Ch. Aug. 17, 2018).

[2] Capitalized terms not defined herein have the meaning given to them in the Opinion.

2

*Del. C.* § 253. Plaintiffs' shares of DWR were acquired in the Merger. The total equity value of the transaction was approximately $170 million.

In their initial Complaint, plaintiffs challenged a number of transactions preceding the Merger that allegedly reduced their percentage ownership of the Company improperly and deprived them of a greater share of the Merger consideration. One of those challenges concerned Glenhill's conversion of shares of Series A preferred stock into shares of common stock in October 2013. According to plaintiffs, this conversion was wrongful because Glenhill purported to convert more shares of Series A preferred stock than were authorized at the time and thus received more shares of common stock than it was entitled to receive.[3] The initial Complaint did not assert, however, that the Merger was invalid. Plaintiffs subsequently amended their initial Complaint four times but they never challenged the fairness of the Merger consideration.

In their Second Amended Complaint, filed in November 2015, plaintiffs added Herman Miller as a defendant and asserted for the first time that the Merger was void as a result of defects concerning (i) the implementation of a 50-to-1 reverse stock split in 2010 of both the Company's common stock and its Series A preferred stock (the "Reverse Stock Splits") and (ii) the conversion in 2013 of the Series A

---

[3] *See* Verified Complaint ¶¶ 56-58 (Dkt. 1).

preferred stock and of a convertible note into shares of common stock (the "2013 Conversions"). As explained in the Opinion, unknown to anyone at the time, the Reverse Stock Splits were implemented in a defective manner that had the effect of diluting the number of shares of common stock into which the Series A preferred stock could be converted by a factor of 2500-to-1 instead of the plainly intended result of a 50-to-1 adjustment. According to plaintiffs, because of the defects identified in the Second Amended Complaint, Herman Miller had acquired "far less than 90% of DWR's shares validly issued and outstanding at the time of the Merger," which meant that "the Merger was not properly effected" as a short-form merger under 8 *Del. C.* § 253 and was therefore invalid.[4]

In February 2016, after the filing of the Second Amended Complaint, Herman Miller took action under 8 *Del. C.* § 204 to ratify certain defective corporate acts and putative stock relating to the Reverse Stock Splits and 2013 Conversions. Herman Miller then filed a counterclaim asking the court to validate seven defective corporate acts (the "Defective Acts") under 8 *Del. C.* § 205. In July 2016, Herman Miller moved for summary judgment on its counterclaim, which plaintiffs opposed. Given the technical nature of the Defective Acts and the need for context concerning the implementation of the underlying transactions, the court denied the motion for

---

[4] Second Amended Complaint ¶¶ 96-104, 112 (Dkt. 61).

4

summary judgment so that a full factual record could be developed before adjudicating the request for judicial validation under Section 205.[5]

In August 2017, a few months before trial, plaintiffs filed their Fourth Amended Complaint, which asserted twelve claims, including a newly added claim for aiding and abetting against Herman Miller. Three of the twelve claims proceeded from the premise that defendants unlawfully benefited from, or converted to their own benefit, a greater percentage of the Company's equity in connection with the Merger as a result of the Defective Acts.

In connection with the trial, plaintiffs dropped their opposition to judicial validation of five of the Defective Acts. Plaintiffs continued to oppose, however, validation of two of the Defective Acts that were at the heart of the double dilution mistake arising from the Reverse Stock Splits. In other words, plaintiffs continued to oppose Herman Miller's efforts to ensure that the Reverse Stock Splits achieved their intended result of reducing by a factor of 50-to-1 the number of shares of common stock into which the Series A preferred stock could be converted instead of a 2500-to-1 adjustment.

In August 2018, the court issued the Opinion and entered judgment in favor of defendants on all twelve of plaintiffs' claims and in favor of Herman Miller on its

---

[5] *See* Tr. 97-101 (Jan. 31, 2017) (Dkt. 225).

counterclaim under Section 205. Relevant to the counterclaim, the court found that there was "*zero* evidence in the record that anyone involved intended for the Reverse Stock Splits to cause . . . double dilution" and that "all of the equitable considerations identified in Section 205 overwhelmingly favor judicial validation" of all the Defective Acts.[6] The court further commented that "plaintiffs' selective opposition to validation of the [Defective Acts] . . . (*i.e.*, not opposing validation of the Reverse Stock Splits but opposing validation of the issuances to preserve the double dilution problem) betrays an intention to obtain a windfall for themselves in this litigation."[7]

On November 2, 2018, plaintiffs filed a motion for an award of attorneys' fees and expenses in the amount of $1.5 million (the "Motion").

## II. THE PARTIES' CONTENTIONS

Plaintiffs argue that they are entitled to a fee award under the corporate benefit doctrine because they "identified what Herman Miller's high-priced due diligence team had missed: the seven defective corporate acts" that were judicially validated in the Opinion under Section 205.[8] According to plaintiffs, "[t]hat validation legitimized the Merger for DWR" and "thereby conferred a substantial corporate benefit on DWR and Herman Miller."[9]

---

[6] *Almond*, 2018 WL 3954733, at *1, *17.

[7] *Id*. at *21.

[8] Mot. ¶ 2 (Dkt. 390).

[9] *Id*. ¶ 3.

6

The many lawyers representing plaintiffs in this action were compensated at their standard hourly rates and did not work on a contingent basis.[10] Plaintiffs assert that their counsel's discovery of defective corporate acts came "at Plaintiffs' considerable expense"[11] but the affidavits submitted by their counsel, which catalogue a wide variety of issues and tasks counsel performed,[12] make no effort to estimate the amount of time devoted to identifying the defective corporate acts alleged in their original Complaint or the Second Amended Complaint.[13]

Plaintiffs note in the Motion that, for purposes of their fee application, they "accept the Opinion's rejection of their claims challenging the effectiveness of DWR's ratification of the defective corporate acts and of the Merger" but that they "reserve the right to appeal the Court's holdings reflected in the Opinion to the Delaware Supreme Court."[14]

Defendants do not argue that plaintiffs' fee application fails to satisfy the basic elements of the corporate benefit doctrine. Defendants instead oppose the

---

[10] Brown Aff. ¶ 2; Ladig Aff. ¶ 4; Ledley Aff. ¶ 4; Monhait Aff. ¶ 4; Watnik Aff. ¶ 2 (Dkt. 390).

[11] Mot. ¶ 2.

[12] Brown Aff. ¶¶ 3, 8; Ladig Aff. ¶ 2; Ledley Aff. ¶ 2; Monhait Aff. ¶ 2; Watnik Aff. ¶¶ 3, 9.

[13] *See* Brown Aff.; Ladig Aff.; Ledley Aff.; Monhait Aff.; Watnik Aff. In total, plaintiffs incurred approximately $5 million in attorneys' fees and $148,000 of expenses. Brown Aff. ¶¶ 4, 10, 11; Ladig Aff. ¶¶ 5, 7, 9, 11; Ledley Aff. ¶¶ 5, 7; Monhait Aff. ¶¶ 5, 7; Watnik Aff. ¶¶ 4, 5, 11, 12.

[14] Mot. ¶ 3 n.5.

application on essentially two grounds. First, defendants argue that it would be inequitable to grant the application because plaintiffs "endeavored to prevent" rather than confer a benefit on DWR.[15] Second, defendants argue that plaintiffs did not confer a "net benefit" on DWR or Herman Miller because plaintiffs "subjected DWR to a trial on the defective capital structure allegations that they now claim to have saved DWR from—and lost."[16]

Although defendants contend that prevailing in this action "came at great cost to DWR and Herman Miller," they—like plaintiffs—do not quantify the amount of expenses they incurred in connection with any particular part of this litigation, including the effort devoted to obtaining judicial validation of the Defective Acts, and they provide no supporting documentation concerning any of the expenses they incurred.[17] Finally, defendants contend that the amount of plaintiffs' fee request is excessive and that, if any award were to be granted, $15,000 would be adequate to compensate plaintiffs fairly.

## III. ANALYSIS

As our Supreme Court has observed, "litigants in Delaware are generally responsible for paying their own counsel fees, absent special circumstances or a

---

[15] Defs.' Opp'n Br. ¶ 14.

[16] *Id.* ¶ 20.

[17] *Id.* ¶ 22.

8

contractual or statutory right to receive fees."[18]  One special circumstance is that this court "may order the payment of counsel fees and related expenses to a plaintiff whose efforts result in the creation of a common fund . . . or the conferring of a corporate benefit."[19]  The power to award fees in this circumstance "is a flexible one based on the historic power of the Court of Chancery to do equity in particular situations."[20]

Under the corporate benefit doctrine, a litigant may receive an award of attorneys' fees if "(a) the action was meritorious at the time it was filed, (b) an ascertainable group received a substantial benefit, and (c) a causal connection existed between the litigation and the benefit."[21]  Plaintiffs assert that each of these elements has been satisfied here.  Defendants do not contend otherwise.  The court agrees with plaintiffs that they have satisfied each of these elements.

---

[18] *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 686 (Del. 2013) (internal quotation marks omitted).

[19] *Tandycrafts, Inc. v. Initio P'rs*, 562 A.2d 1162, 1164 (Del. 1989).

[20] *Id.* at 1166; *see also Maurer v. Int'l Re-Ins. Corp.*, 95 A.2d 827, 831 (Del. 1953) ("[T]he foundation for the historic practice of granting reimbursement for the costs of litigation other than the conventional taxable costs is part of the original authority of the Chancellor to do equity in a particular situation.") (quoting *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 166 (1939)).

[21] *Dover Historical Soc'y, Inc. v. City of Dover Planning Comm'n*, 902 A.2d 1084, 1089 (Del. 2006).  The Supreme Court in *Dover Historical Society* referred to a "common benefit" instead of a "corporate benefit."  I view these phrases to be interchangeable.

"[F]or a suit to be considered meritorious when filed, the complaint must have been able to have survived a motion to dismiss, whether or not such a motion was filed."[22]  Plaintiffs' original Complaint and, more importantly, their Second Amended Complaint identified many (but not all) of the Defective Acts for which Herman Miller sought judicial validation under Section 205.  In particular, the Second Amended Complaint identified defective corporate acts relating to the implementation of the Reverse Stock Splits, which caused the double dilution mistake that imperiled the validity of the Merger.  In the Opinion, the court entered judgment in Herman Miller's favor, granting in full the judicial validation it sought.  Thus, the aspects of plaintiffs' pleadings asserting claims based on defective corporate acts that were judicially validated in the Opinion were meritorious when filed.

With respect to the element of causation, Delaware law presumes that a plaintiff's action caused the benefit when a corporate defendant "takes action that renders the claims asserted in the complaint moot" and imposes on the corporation "the burden of persuasion to show that no causal connection existed between the initiation of the suit and any later benefit to the shareholders."[23]  Defendants made

---

[22] *BTZ, Inc. v. Nat'l Intergroup, Inc.*, 1993 WL 133211, at *2 (Del. Ch. Apr. 7, 1993) (citing *Chrysler Corp. v. Dann*, 223 A.2d 384, 387 (Del. 1966)).

[23] *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1080 (Del. 1997).

10

no effort to rebut the presumption of causation, and for good reason. The trial record reflects that, notwithstanding the extensive due diligence it undertook before acquiring the Company, Herman Miller (i) was unaware of any of the Defective Acts plaintiffs identified until it saw them in plaintiffs' pleadings and (ii) took action to ratify and seek judicial validation of them only after plaintiffs filed their Second Amended Complaint.[24]

Finally, plaintiffs argue that DWR and Herman Miller received a corporate benefit as a result of judicial validation of the Defective Acts they identified because "[t]hat validation legitimized the Merger."[25] The court agrees with this statement as far as it goes.[26] Judicial validation of the Defective Acts, particularly those relating to implementation of the Reverse Stock Splits, ensured that Herman Miller had acquired over 90% of DWR's stock before the Merger so that it could utilize a short-form merger under 8 *Del. C.* § 253 to acquire the balance of the Company's shares. In other words, the relief Herman Miller obtained under Section 205 removed a cloud hovering over the validity of the Merger and thus its ownership of DWR.

This court has granted awards of attorneys' fees under the corporate benefit

---

[24] *See Almond*, 2018 WL 3954733, at *13-14.

[25] Mot. ¶ 3.

[26] As discussed below, what this statement omits, and what is relevant to the overall equities of plaintiffs' fee application, is that plaintiffs steadfastly opposed Herman Miller's request for judicial validation.

doctrine to stockholders on a number of occasions where corporations have taken actions to remedy defects in their capital structures, including through the use of Section 205, in response to a stockholder's identification of the defects.[27] But the granting of a fee award is not automatic just because the three basic elements of the corporate benefit doctrine have been satisfied. As this court explained in *In re Orchard Enterprises, Inc. Stockholder Litigation*, satisfying those elements is "necessary but not sufficient" to obtain a fee award.[28] This is because the corporate benefit doctrine is rooted in the application of equitable principles,[29] and there are

---

[27] *See In re Xencor, Inc.*, C.A. No. 10742-CB, at 4-5, 52-54 (Del. Ch. Dec. 10, 2015) (TRANSCRIPT) (awarding $950,000 for settlement of class-action claim challenging validity of recapitalization transactions and certificate amendments judicially validated under Section 205); *In re Colfax Corp.*, C.A. No. 10447-VCL, at 3-4, 36 (Del. Ch. Apr. 2, 2015) (TRANSCRIPT) (awarding counsel for derivative plaintiffs $375,000 for claim involving violation of certificate of designations that was mooted by judicial validation under Section 205); *In re Cheniere Energy, Inc.*, C.A. No. 9710-VCL, at 10, 98, 104 (Del. Ch. Mar. 16, 2015) (TRANSCRIPT) (awarding counsel for class and derivative plaintiffs $1 million for settlement of claim challenging approval of share issuance that was judicially validated under Section 205); *Olson v. ev3, Inc.*, 2011 WL 704409, at *6-8, *15 (Del. Ch. Feb. 21, 2011) (awarding $1 million to plaintiff's counsel for settlement of claims challenging statutory validity of top-up options that were resolved by amending merger agreement). In each of these four cases, which were featured in plaintiffs' briefs, counsel worked on a contingent basis. Recently, the court awarded a fee to a party that identified defective corporate acts that were judicially validated where counsel worked on a non-contingent basis. *See Cirillo Family Tr. v. Moezinia*, C.A. No. 10116-CB, at 32-43 (Del. Ch. Feb. 19, 2019) (TRANSCRIPT) (awarding plaintiff $70,000 for identifying defects in written consents).

[28] 2014 WL 4181912, at *3 (Del. Ch. Aug. 22, 2014).

[29] *See Tandycrafts*, 562 A.2d at 1166 ("The standard which governs the allowance of counsel fees in equity is not inclusive of all occasions when such fees may be sought. The concept is a flexible one based on the historic power of the Court of Chancery to do equity in particular situations.").

circumstances where it would be inappropriate or inequitable to award attorneys' fees even when the basic elements of the doctrine ostensibly have been satisfied.

In *Orchard*, for example, the court denied a fee request by appraisal claimants who contributed to the settlement of later-filed fiduciary duty claims brought by other stockholders at a price higher than the appraisal claimants achieved at trial. The court reasoned that the appraisal claimants' "counsel lack standing to obtain a fee award" because they "chose not to represent a class" or "to attempt to extend the benefits of their efforts to other stockholders," and "did not need the incentive of a potential fee award to induce them to litigate the fair value of the common stock."[30] In reaching its conclusion, the court analyzed two groups of cases to demonstrate that "[n]ot everyone who contributes to a benefit gets a fee award."[31]

The first group concerned hostile bidders who pursue breach of fiduciary duty litigation against directors of the target corporation.[32] The *Orchard* court observed that "[e]ven when the bidder's litigation generates relief that contributes causally to the sale of the target corporation to a third party at a premium, thereby meeting the

---

[30] 2014 WL 4181912, at *13.

[31] *Id*. at *9.

[32] *See Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 789 A.2d 1216, 1217 (Del. Ch. 2001) (denying fee award to hostile bidder whose efforts otherwise met requirements for fee award under corporate benefit doctrine), *aff'd sub nom. Mentor Graphics Corp. v. Shapiro*, 818 A.2d 959 (Del. 2003); *In re Dunkin' Donuts S'holders Litig.*, 1990 WL 189120, at *1 (Del. Ch. Nov. 27, 1990) (same).

requirements for a fee award, the bidder lacks standing to recover its legal fees under a common fund or benefit theory."[33] This result is the product of "two factors that override the bidder's *prima facie* showing of entitlement to a fee award: (i) the bidder's pursuit of personal interests potentially at odds with those of the class [*i.e.*, the bidder's desire to pay as little as possible for the target corporation whose shares are held by the class], and (ii) the absence of any need to incent a bidder to bring litigation to police fiduciary misconduct."[34]

The second group of cases involved litigants who had made choices to pursue "personal agendas at odds with the interests of other stockholders."[35] In two of these cases, the court found that stockholder plaintiffs lacked standing to pursue claims against directors for breach of the duty of disclosure because the stockholders could not be said to have relied on the disclosures at issue.[36] In the third case, which is

---

[33] 2014 WL 4181912, at *9.

[34] *Id.* at *10.

[35] *Id.* at *11.

[36] *See In re Aristotle Corp.*, 2012 WL 70654, at *3 (Del. Ch. Jan. 10, 2012) (stockholder who pursued appraisal claim after short-form merger lacked standing to pursue breach of fiduciary duty claim against controlling stockholder for failure to disclose all material facts in connection with short-form merger because "the alleged disclosure inadequacies did not in any way impair the petitioners' ability to seek appraisal"); *Andra v. Blount*, 772 A.2d 183, 188-90 (Del. Ch. 2000) (stockholder who (i) abandoned motion for preliminary injunction to challenge disclosures made in a first-step tender offer, (ii) declined to tender her shares, and (iii) was merged out in a short-form merger, could pursue claim for unfair dealing but lacked standing to pursue claim for breach of the duty of disclosure because she had not been injured by any alleged disclosure violations).

discussed in greater detail below, the Delaware Supreme Court found that a stockholder's abandonment of his claim after trial undermined any entitlement to a fee award.[37] Synthesizing these cases, the *Orchard* court explained that:

> a court of equity can deny a plaintiff standing to receive a fee award, regardless of whether the plaintiff otherwise can establish a *prima facie* case supporting an award, if the plaintiff has proceeded in a manner designed to benefit the plaintiff individually—rather than the class as a whole—and any benefit achieved for the class has happened as an incidental by-product of the plaintiff's self-interested pursuit.[38]

One of the cases addressed in *Orchard* that warrants further discussion is our Supreme Court's decision in *Crothall v. Zimmerman*.[39] In that case, a unitholder (Robert Zimmerman) of a limited liability company filed a derivative suit challenging "certain financing transactions and associated unit issuances."[40] After trial, the Court of Chancery rejected "Zimmerman's substantive claims that the unit issuances were in any way unfair" to the company, but found that they violated the company's operating agreement and awarded one dollar of nominal damages because the breach "caused no damage."[41]

---

[37] *Crothall v. Zimmerman*, 94 A.3d 733, 736-37 (Del. 2014).

[38] 2014 WL 4181912, at *12.

[39] 94 A.3d 733.

[40] *Id*. at 734.

[41] *Id*. at 734-35.

Before the parties reached an agreement about the form of final judgment, Zimmerman decided to abandon his lawsuit and sold his units, which deprived him of standing to continue as a derivative plaintiff. Defendants thereafter filed a motion to dismiss the case, which the trial court granted. Undeterred by these developments, plaintiff's counsel sought leave to intervene in the case in order to pursue an application for attorney's fees for creating a corporate benefit. The trial court permitted intervention and awarded Zimmerman's former counsel $300,000 in attorney's fees.

On appeal, the Supreme Court reversed, holding that "no corporate benefit has been created in this case because any benefit that might have been created by continuing this suit to a final, appealable judgment disappeared when Zimmerman abandoned the lawsuit."[42] Although the Supreme Court ultimately did not reach the issue, Chief Justice Strine, writing for the high court, intimated that the trial court also should have considered whether plaintiff's efforts had created a "net benefit" to the company:

> The fee award also failed to consider whether a net benefit that would justify the support of any award of attorney's fees had actually been produced by Zimmerman's former counsel—given that the former plaintiff had lost on most of his claims and had cost the company great expense and time defending those meritless claims.[43]

---

[42] *Id*. at 738.

[43] *Id*. at 736.

As defendants point out, these words echo those of then-Chancellor Allen who commented in *dictum* almost two decades earlier: "I cannot imagine why an inquiry into *net* benefit of the litigation to the corporation would not be a sound technique for judging the equity of fee shifting in a case where defendants prevail on the most central issues . . . ."[44]

None of the cases discussed above is directly on point with this case. The equitable considerations animating those decisions, however, convince me that the plaintiffs' fee application should be denied. Three interrelated factors support this conclusion.

First, as in *Orchard*, the plaintiffs here did not pursue any claims on behalf of a class and did not seek to extend the benefits of their efforts to any other stockholders of DWR in any meaningful sense.[45] To be sure, individual stockholders have standing to seek an award of attorneys' fees under the corporate benefit doctrine

---

[44] *Thorpe v. CERBCO, Inc.*, 1997 WL 67833, at *2 n.1 (Del. Ch. Feb. 6, 1997), *aff'd*, 703 A.2d 645 (Del. 1997) (TABLE).

[45] Plaintiffs note that one of them (Franklin) "brought in several assignors to share in the recovery." Pls.' Reply Br. 5 n.4. The terms of the various assignments, however, reflect that the proceeds for the assignors' shares first would be used to reimburse Franklin for all of his legal expenses and that 60-75% of the net proceeds would then have gone to Franklin. *See* JX 463 at 1, 2 (entitling Franklin to 75% of the defined share of the proceeds after deducting Franklin's legal expenses); JX 467 at 16, 18 (same but entitling Franklin to about 65% of the proceeds after expenses); JX 476 at 1, 3 (same but entitling Franklin to 60% of the proceeds after expenses).

17

as a general matter.[46]  But the decision plaintiffs made here to refrain from representing the interests of similarly situated stockholders of DWR suggests that these plaintiffs—who paid their counsel on a non-contingent basis—needed no additional incentive to pursue this litigation because their motivation was to serve their personal interests and not the interests of DWR or any of its other stockholders.

Second, and most importantly, it would be inequitable in my opinion to reward plaintiffs for "conferring" a benefit they have fought to prevent throughout this litigation.  As explained above, rather than choosing to work constructively with defendants once Herman Miller sought judicial validation of the Defective Acts in order to promptly correct what should have been obvious to plaintiffs to be a series of technical mistakes, plaintiffs chose a path of opposition.  Specifically, plaintiffs opposed Herman Miller's motion for summary judgment on its counterclaim for judicial validation, continued at trial to oppose judicial validation of the Defective Acts central to remedying the double dilution mistake underlying the Reverse Stock Splits, and even now have held open the prospect of further litigation over the Defective Acts on appeal.

As explained in the Opinion, given the lack of *any* evidence—as well as any rational reason—to support the notion that the Reverse Stock Splits were intended

---

[46] *See Tandycrafts*, 562 A.2d at 1164-67 (holding that an individual stockholder had standing to seek an award of attorneys' fees for conferring a benefit upon the corporation or its stockholders).

18

to reduce the number of shares of common stock into which the Series A preferred stock could be converted by a factor of 2500-to-1 (*i.e.*, 98% dilution) instead of 50-to-1, plaintiffs' steadfast opposition to remedying the double dilution mistake for which they now seek to take credit betrays their intention to obtain an inequitable windfall for themselves. I decline to reward these actions with an award of attorneys' fees under the guise of the "historic power of the Court of Chancery to do equity in particular situations."[47]

Third, and unsurprisingly, plaintiffs have identified no precedent in which this court has awarded attorneys' fees in similar circumstances. Each of the four precedents on which plaintiffs rely involved the settlement or mooting of claims concerning defective corporate acts, where the corporations obtained the remedial benefits quickly, consensually, and without being forced to engage in protracted litigation.[48] In other words, each of these precedents involved pursuit of the path plaintiffs chose to eschew, *i.e.*, to work cooperatively to correct technical defects in a prompt and efficient manner. Here, by contrast, the path of vigorous opposition plaintiffs chose unnecessarily caused delay in reaching a resolution and imposed significant costs on defendants that were entirely avoidable.[49]

---

[47] *Id.* at 1166.

[48] *See supra* note 27.

[49] The record before the court is too undeveloped and fluid to conduct a "net benefit" analysis along the lines suggested in *Crothall v. Zimmerman*. As noted above, plaintiffs

In sum, based on the factors discussed above, in particular plaintiffs' steadfast opposition to curing all of the Defective Acts in order to pursue an inequitable windfall for themselves, the court declines to exercise its equitable discretion to award attorneys' fees to plaintiffs in this case.

## IV.    CONCLUSION

For the reasons explained above, plaintiffs' Motion is denied.    An implementing order that constitutes the final order in this action accompanies this decision.

---

made no effort to estimate the portion of the legal fees they incurred in identifying any of the Defective Acts.  *See PaineWebber R & D P'rs II, L.P. v. Centocor, Inc.*, 2000 WL 130632, at *5 (Del. Ch. Jan. 31, 2000) (objector that contributed to the creation of a benefit for the class was only entitled to reimbursement of "its hourly rate payments to its counsel" and was not entitled to any enhancement because counsel did not take the case on a contingent basis and thus "incurred no risk").  Defendants also did not attempt to estimate the amount of fees they incurred by being forced to go to trial to obtain Section 205 relief. Finally, plaintiffs expressly have reserved the right to appeal the court's Section 205 ruling, which would result in the incurrence of additional fees that may need to be taken into account.