## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE FACEBOOK INC. DERIVATIVE LITIGATION | ) ) | CONSOLIDATED C.A. No. 2018-0307-JTL |

## MEMORANDUM OPINION IMPOSING SANCTIONS FOR SPOLIATION

Date Submitted: December 9, 2025
Date Decided: January 21, 2025

Justin O. Reliford, SCOTT+SCOTT, Wilmington, Delaware; Maxwell R. Huffman, SCOTT+SCOTT, San Diego, California; Donald A. Broggi, Jing-Li Yu, SCOTT+SCOTT, New York, New York; Geoffrey M. Johnson, SCOTT+SCOTT, Cleveland Heights, Ohio; *Co-Lead Counsel and Counsel for Co-Lead Plaintiff City of Birmingham Retirement and Relief System.*

Frederic S. Fox, Hae Sung Nam, Donald Hall, Aaron Schwartz, KAPLAN FOX & KILSHEIMER LLP, New York, New York; *Co-Lead Counsel and Counsel for Co-Lead Plaintiff California State Teachers' Retirement System and for Plaintiff Firemen's Retirement System of St. Louis.*

Kevin H. Davenport, Samuel L. Closic, John G. Day, Stacey A. Greenspan, David C. Skoranski, Kirsten M. Valania, Seth T. Ford, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; *Co-Lead Counsel and Counsel to Co-Lead Plaintiffs Construction and General Building Laborers' Local Union No. 79 General Fund and City of Birmingham Retirement and Relief System and to Plaintiff Lidia Levy.*

Frank R. Schirripa, Daniel B. Rehns, Kurt M. Huciker, Kathryn A. Hettler, Scott R. Jacobsen, HACH ROSE SCHIRRIPA & CHEVERIE LLP, New York, New York, *Co-Chair of Executive Committee of Plaintiffs' Counsel and Counsel to Co-Lead Plaintiff Construction and General Building Laborers' Local Union No. 79 General Fund, and Additional Counsel to Plaintiffs.*

Thaddeus J. Weaver, DILWORTH PAXSON LLP, Wilmington, Delaware; *Co-Chair of Executive Committee of Plaintiffs' Counsel and Counsel to Plaintiff Karen Sbriglio and Additional Plaintiffs.*

Catherine Pratsinakis, DILWORTH PAXSON LLP, Philadelphia, Pennsylvania; *Co-Chair of Executive Committee of Plaintiffs' Counsel and Counsel to Plaintiff Karen Sbriglio.*

Thomas J. McKenna, Gregory M. Egleston, GAINEY McKENNA & EGLESTON, New York, New York; *Executive Committee of Plaintiffs' Counsel and Additional Counsel for Plaintiffs.*

Peter B. Andrews, Craig J. Springer, David M. Sborz, Jacob D. Jeifa Esq., ANDREWS & SPRINGER, Wilmington, Delaware; Brian J. Robbins, Stephen J. Oddo, Gregory E. Del Gaizo, ROBBINS LLP, San Diego, California; Joseph W. Cotchett, Mark Molumphy, Tyson Redenbarger, Gia Jung, COCHETT PITRE & McCARTHY LLP, Burlingame, California; Joseph J. Tabacco, Jr., Daniel E. Barenbaum' BERMAN TABACCO, San Francisco, California; *Executive Committee of Plaintiffs' Counsel and Additional Counsel for Plaintiffs.*

Kevin R. Shannon, Berton W. Ashman, Jr., Callan R. Jackson, Justin T. Hymes, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; William Savitt, Ryan McLeod, Anitha Reddy, Stephen D. Levandoski, Iliria Camaj, Tobias Kuehne, WACHTELL, LIPTON, ROSEN & KATZ, New York, New York; *Attorneys for Defendants Mark Zuckerberg, Sheryl K. Sandberg, Kostantinos Papamiltiadis, Jeffrey D. Zients, Peggy Alford, Kenneth I. Chenault, Peter A. Thiel, Susan D. Desmond-Hellmann, Reed Hastings, Marc L. Andreessen, and Erskine B. Bowles.*[1]

**LASTER, V.C.**

---

[1] Sixteen law firms signed the latest joint stipulation governing the case schedule. *See* Dkt. 505. Even more law firms have entered appearances. The counsel listed here are the counsel appearing in the signature blocks of the filings related to the spoliation motion.

The plaintiffs moved for sanctions against two individual defendants who failed to preserve electronically stored information ("ESI"). The plaintiffs succeeded against the defendant who was a C-suite officer and director. The plaintiffs failed against the defendant who was an outside director.

As a sanction, the officer defendant will only be able to prevail on any issue where she bears the burden of proof if she can carry her burden by clear and convincing evidence. The officer defendant also must pay the expenses plaintiffs incurred pursuing sanctions.[2]

## I.     FACTUAL BACKGROUND

The facts are drawn from the parties' submissions in connection with the motion seeking sanctions.[3] The court has also considered other documents of record

---

[2] The term "expenses" refers collectively both to attorneys' fees and amounts paid out of pocket that might be referred to more traditionally and colloquially as expenses. This is how Section 145 of the Delaware General Corporation Law deploys the term. *See, e.g.*, 8 *Del C.* § 145(a) (authorizing a corporation in a proceeding other than one brought by or in the right of the corporation to provide indemnification "against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred"); *id.* § 145(b) (authorizing a corporation in a proceeding brought by or in the right of the corporation to provide indemnification "against expenses (including attorneys' fees) actually and reasonably incurred"); *id.* § 145(c) (mandating corporation to indemnify a director or officer who was successful on the merits or otherwise in defending a proceeding "against expenses (including attorneys' fees) actually and reasonably incurred"). The out-of-pocket expenses encompassed by Section 145 are broader than the restricted concept of "costs" in the statute that authorizes the recovery of court costs in the Court of Chancery. *See* 10 *Del. C.* § 5106; *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 686–88 (Del. 2013).

[3] Citations in the form "Compl. ¶ ____" refer to the paragraphs of the operative complaint. Citations in the form "Mot. ¶ ____" refer to paragraphs of Plaintiff's Motion for Curative Relief And Sanctions Against Defendants Sheryl Sandberg and Jeffrey

and matters suitable for judicial notice. What follows are not formal factual findings, but rather how the record appears at this stage of the case.

## A.    The Consent Order

In 2011, the Federal Trade Commission filed an eight-count complaint against Meta Platforms, Inc. ("Meta" or the "Company"), a Delaware corporation. The Company owns and operates social media platforms including Facebook, Messenger, WhatsApp, and Instagram.

The FTC alleged that since 2007, the Company allowed third parties to develop, run, and operate applications on the Facebook platform that enabled third parties to obtain personal information about Facebook users. The complaint explained that the Company generated revenue from the third-party developers. The complaint charged that the Company had "deceived consumers by telling them they could keep their information on Facebook private, and then repeatedly allowing it be shared and made public."[4]

---

Zients. Citations in the form "DOB ¶ ____" refer to paragraphs of Defendants' Opposition To Plaintiffs' Motion For Curative Relief And Sanctions Against Sheryl Sandberg And Jeffrey Zients, and citations in the form "Readinger Aff. ¶ ____" refer to paragraphs in the Affidavit of Laura G. Readinger in support of that brief. Citations in the form "PRB at ____" refer to the Plaintiffs' Reply Brief in support of their motion, and citations in the form "Huffman Aff. ¶ ____" refer to paragraphs in Affidavit of Maxwell R. Huffman in support of their reply. Citations in the form "Ex. [number] at ____" refer to plaintiffs' exhibits submitted in connection with their motion and reply brief.

[4] Compl. ¶ 81 (internal quotations marks omitted).

On July 27, 2012, the Company settled the charges by entering into a consent decree (the "Consent Order"). Its terms required that the Company

- not make "any further deceptive privacy claims";

- "get consumers' approval before it changes the ways it shares their data";

- "obtain periodic assessments of its privacy practices by independent, third-party auditors for the next 20 years";

- not make misrepresentation about the privacy or security of consumers' personal information;

- obtain consumers' affirmative express consent before enacting changes that override their privacy preferences;

- prevent anyone from accessing a user's material more than 30 days after the user has deleted his or her account;

- establish and maintain a comprehensive privacy program designed to address privacy risks associated with the development and management of new and existing products and services, and to protect the privacy and confidentiality of consumers' information; and

- within 180 days, and every 2 years after that for the next 20 years, obtain independent, third-party audits certifying that it has a privacy program in place that meets or exceeds the requirements of the Consent Order, and ensure that the privacy of consumers' information is protected.[5]

Since 2012, foreign governments have charged the Company with violating privacy laws and regulations addressing the same topics as the Consent Order. Those actions include:

---

[5] Compl. ¶ 89.

3

- A 2016 fine by a German court for failing to clearly state in the terms and conditions the extent to which Facebook licensed users' intellectual property, such as photos and videos, to third parties.[6]

- A 2017 fine imposed by France's privacy regulator for misusing user data for targeted advertising and for using cookies to illegally track what users did on and off the Company's platforms.[7]

- A 2017 fine imposed by the European Union's antitrust regulator for changing the Company's privacy policy, contrary to a 2014 pledge to segregate WhatsApp data from the Company's other platforms.[8]

## B. The Cambridge Analytica Scandal

In March 2018, *The New York Times* reported that Cambridge Analytica, a British data analytics firm, had harvested the private information of more than 50 million Facebook users without their permission.[9] The article reported that Cambridge Analytica paid the Company for information that included users'

---

[6] Compl. ¶ 302 (citing Reuters Staff, *German Court Fines Facebook $109,000 in Dispute Over IP License Clause*, REUTERS (Feb. 29, 2016), https://www.reuters.com/article/us-facebook-germany/german-court-fines-facebook-109000-in-dispute-over-ip-license-clause-idUSKCN0W21W4).

[7] Compl. ¶ 303 (citing Samuel Gibbs, *Facebook Facing Privacy Actions Across Europe as France Fines Firm €150k*, THE GUARDIAN (May 16, 2017), https://www.theguardian.com/technology/2017/may/16/facebook-facing-privacy-actions-across-europe-as-france-fines-firm-150k).

[8] Compl. ¶ 304 (citing Reuters Staff, *EU Fines Facebook 110 Million Euros Over WhatsApp Deal*, REUTERS (May 18, 2017), https://www.reuters.com/article/us-eu-facebook-antitrust/eu-fines-facebook-110-million-euros-over-whatsapp-deal-idUSKCN18E0LA).

[9] Matthew Rosenberg, et al., *How Trump Consultants Exploited the Facebook Data of Millions*, N.Y. TIMES (Mar. 17, 2018), https://www.nytimes.com/2018/03/17/us/politics/cambridge-analytica-trump-campaign.html.

identities, personal identifying information, friends, and "likes."[10] The Consent Order

prohibited those practices.

## C.     The Legal Hold

Shortly after the Cambridge Analytica scandal broke, the Company issued a

legal hold.[11] It stated:

> Litigation has been filed regarding, and certain U.S. and international
> governmental bodies and other third parties have indicated that they
> intend to investigate, events related to Dr. Aleksandr Kogan's use of the
> Facebook Platform and his and our interactions with Cambridge
> Analytica (CA), Strategic Communication Laboratories (SLC), Eunoia
> Technologies, Inc., and Christopher Wylie.[12]

The legal hold instructed its custodians that they "have a legal obligation to preserve

and not destroy any pertinent evidence in [their] possession that could be relevant to

this matter."[13]

> The legal hold specified that the retention obligation applied to

> all hard copy and electronic data and documents (such as files, data
> tables or logs, notes, memos, spreadsheets, docs stored in Dropbox and
> Box, Quip, and Google or Zoho Docs), and all correspondence (such as
> email, instant messages, Skype messages, WhatsApp messages, FB
> Messages, text messages, FB Group posts, and letters).[14]

The legal hold also identified more specific categories of documents, including:

---

[10] *Id.*

[11] *See* Ex. 1.

[12] *Id.*

[13] *Id.*

[14] *Id.*

5

- "Documents that refer or relate to **Aleksandr Kogan, Aleksandr Spectre, or Global Science Research (GSR), and University of Cambridge**;"

- "Documents that refer or relate to **the app "thisisyourdigitallife" (App ID: 599050663475147)**;"

- "Documents that refer or relate to **Cambridge Analytica (CA), Strategic Communication Group, Strategic Communication Laboratories (SCL), SCL Elections Limited, or Alexander Nix**;"

- "Documents that refer or relate to **Christopher Wylie or Eunoia Technologies, Inc.**;"

- "Documents that refer or relate to **Michael lnzlicht, Daniel Randles, University of Toronto, or Toronto Laboratory for Social Neuroscience**; or"

- "Documents that refer or relate to **developer access to user data via apps integrated with the Facebook Platform**."[15]

The legal hold instructed custodians to make certain that they "do not delete or destroy" documents and explained that if custodians were "unsure whether a document is relevant to matters, save it." [16] The legal hold told recipients, "If you create a document in the future that is relevant to the matters, save it."[17]

Sheryl Sandberg, a member of the Company's senior leadership team, received the legal hold. At the time, she served as the Company's Chief Operating Officer, a role she held until August 2022. She also served as a member of the Company's board of directors (the "Board"), a position she held until May 2024.

---

[15] *Id.* (original emphasis).

[16] *Id.*

[17] *Id.*

6

**D.    This Litigation**

This litigation began on April 25, 2018. As it progressed, the Company reminded the custodians about the legal hold. After Jeffrey Zients joined the Board in 2018, the Company sent him the legal hold.[18] Zients served on a special committee tasked with evaluating and recommending a potential settlement with the FTC.

On July 31, 2018, outside counsel contacted Sandberg and Zients "to discuss document preservation and collection in connection with the Cambridge Analytica-related derivative cases."[19] In November 2018, outside counsel contacted Zients to discuss his preservation obligations.[20]

**E.    Discovery**

On May 10, 2023, the court denied the defendants' motion to dismiss. After that ruling, the parties moved forward with discovery.

Discovery has been extensive. The defendants have collected documents from thirty-two custodians and dozens of unique custodial sources, including business and personal email accounts, messaging platforms, and Meta Workplace communication tools.[21] The defendants have produced over 1.7 million documents containing over 8.9 million pages.

---

[18] Mot. ¶ 4; DOB ¶ 6.

[19] Ex. 5.

[20] Ex. 6.

[21] DOB ¶ 8; Readinger Aff. ¶ 3.

Between November 3, 2023 and March 28, 2024, the plaintiffs asked the defendants about their collection of ESI.[22] On April 3, 2024, the plaintiffs served interrogatories seeking information about the preservation of ESI.[23] In their answers, the defendants disclosed Sandberg's personal Gmail account,[24] maintained under a pseudonym, that she used to "communicate about matters potentially relevant to the claims and defenses in this action."[25] The defendants' disclosed that "Sandberg's Gmail emails were collected and preserved for other litigations" and that counsel was "investigating their availability."[26] Then came the big disclosure: "Prior to this litigation, Defendant Sandberg had a practice of regularly deleting emails from her Gmail account that are over 30 days old."[27]

The defendants similarly disclosed that Zients used a personal email account to "communicate about matters potentially relevant to the claims and defenses in this

---

[22] Mot. ¶ 7.

[23] Ex. 14.

[24] Ex. 15 at 8. Defendants maintain Sandberg "communicated about business through her company email account," and that "[s]he also maintained a personal Gmail account, but avoided using it for company matters." DOB ¶ 5. Defendants argue that Sandberg "could not control the address at which others emailed her," accepting that emails involving business matters sometimes went to her Gmail account. *Id.*

[25] Ex. 15 at 8.

[26] *Id.* at 9.

[27] *Id.*

8

action."[28] They reported that Zients's account had an "approximately six-month data retention practice during his board tenure."[29] In other words, the account deleted older emails. The defendants stated that they were "investigating whether any data from that account was backed up or stored locally and could be recovered."[30]

On May 8, 2024, the plaintiffs asked when Sandberg stopped deleting emails from her Gmail account and the status of her recovery efforts. On June 18, the defendants declined to answer, citing the ongoing nature of their investigation.[31] The plaintiffs asked about Zients's emails. The defendants reported that after an "investigation and consultation with a forensic ediscovery specialist, the individual defendants do not believe that any emails from [Zients's] personal account in the collection period were retained on any local media."[32]

On June 26, 2024 the plaintiffs followed up about Sandberg and Zients's document preservation efforts. The plaintiffs asked again about when Sandberg stopped deleting her Gmail emails. They also asked whether Zients preserved his

---

[28] *Id.* at 10. Defendants agree that "Zients used three email accounts to communicate about Meta-related matters: a company account, a business account, and a personal account." DOB ¶ 6. Zients's company email account and business email account were fully preserved. *Id.*

[29] Ex. 15 at 10.

[30] *Id.*

[31] Ex. 17.

[32] *Id.*

documents from the final six months of his Board tenure (November 2019 to May 2020). The plaintiffs proposed including Sandberg and Zients's personal email addresses in the ESI search terms.[33] The defendants declined.[34]

On August 9, 2024 the defendants informed the plaintiffs that "there is no specific date in which Ms. Sandberg's email practice was in place with respect to her personal Gmail account. Because there is no specific date, at this time, we cannot provide a specific date at which she ceased the practice."[35] The defendants also reported no one collected "any emails from [Zients's personal] account," and the deleted emails were irretrievably lost.[36]

## F.    Mitigation Efforts

Having disclosed that Sandberg and Zients failed to preserve ESI, the defendants investigated whether the data could be obtained from other sources. The defendants also examined the ESI that remained in an effort to draw inferences about what the lost ESI might have contained.

For Sandberg, defense counsel reviewed approximately 3,800 emails from her Gmail account plus 300 other documents obtained that her counsel had from other

---

[33] Ex. 19 (June 26, 2024 email from A. Schwartz to C. Jackson).

[34] Ex. 21. (July 16, 2024 email from C. Jackson to J. Day).

[35] *Id.* (August 9, 2024 email from C. Jackson to A. Schwartz).

[36] *Id.* While emails from Sandberg and Zients's personal accounts are lost, the documentary record contains at least 11,576 communications involving Sandberg and at least 527 communications involving Zients. DOB Readinger Aff. ¶ 3.

10

litigation. None were responsive. There were also 57 emails in the record that were also sent to or from Sandberg's Gmail account, so those emails were not lost.

For Zients, defense counsel reviewed over 6,500 documents from Zients's other accounts and identified 415 that were sent to or from his personal account, so those emails were not lost. Defense counsel produced 527 documents in which one of Zients's three email addresses appears in the from, to, cc, or bcc metadata fields.

## II.    LEGAL ANALYSIS

The plaintiffs moved for curative sanctions for spoliation. "Spoliation is the destruction or significant alteration of evidence, the failure to preserve evidence properly for another's use, or the improper concealment of evidence."[37] The plaintiffs contend that Sandberg and Zients spoliated evidence by failing to preserve ESI.

Court of Chancery Rule 37(e) addresses the failure to preserve ESI. It states:

> If ESI that should have been preserved in the reasonable anticipation of or actual notice of imminent litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted recklessly or with the intent to deprive another party of the information's use in the litigation, may, among other things:
>
> > (A) presume that the lost information was unfavorable to the party; or

---

[37] *Goldstein v. Denner*, 310 A.3d 548, 567 (Del. Ch. 2024).

(B) dismiss the action or enter a default judgment.

Emails are a type of ESI, so Rule 37(e) applies.[38]

Under Rule 37(e), to obtain sanctions for a party's failure to preserve ESI, the requesting party must show (i) the responding party had a duty to preserve the ESI, (ii) the ESI is lost, (iii) the loss is attributable to the responding party's failure to take reasonable steps to preserve the ESI, and (iv) the requesting party suffered prejudice.[39] For an adverse inference or case-dispositive sanctions, the plaintiff must show that the responding party acted recklessly or intentionally when failing to preserve ESI.[40]

## A.    The Threshold Issue of Timing

When considering a motion addressing spoliation, there is always a threshold question about timing. The plaintiffs here moved while discovery was ongoing, rather than just before or after trial. Several Delaware decisions have deferred ruling on spoliation motions until after trial.

---

[38] *See KT4 P'rs LLC v. Palantir Techs. Inc.*, 203 A.3d 738, 751 (Del. 2019) ("'Emails,' of course, are a type of 'electronic document.'").

[39] *Goldstein*, 310 A.3d at 557.

[40] *Id.* at 583.

"Delaware trial courts have inherent power to control their dockets."[41] That authority includes determining how a case should proceed for the "orderly adjudication of claims."[42]

Determining when to address a spoliation motion "rests in the discretion of the court based on the facts of each case."[43] Pertinent factors include "the nature of the spoliation, the stage of the case, the court's ability to provide case-specific relief, and any scheduling order that might apply."[44] "If a party seeks an order compelling the defendants to provide additional discovery or to pay for the movant to conduct additional discovery, then it would be foolish to defer the motion until trial."[45] Along similar lines, "[i]f a ruling on the motion will help the parties prepare for trial or limit the issues to be addressed at trial, then it often will make sense to address the motion before trial."[46] But "[i]f the motion turns on evidentiary issues that the court will evaluate at trial, then it will make sense to defer the motion until trial."[47]

---

[41] *Solow v. Aspect Res., LLC*, 46 A.3d 1074, 1075 (Del. 2012).

[42] *Unbound P'rs Ltd. P'ship v. Invoy Hldgs. Inc.*, 251 A.3d 1016, 1030 (Del. Super. 2021) (cleaned up).

[43] *Goldstein*, 310 A.3d at 571.

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Id.*

13

Here, the motion rests on undisputed facts regarding the failure to preserve ESI. The motion does not turn on disputed facts that would warrant an evidentiary hearing or post-trial adjudication. Moreover, the plaintiffs seek remedies that would affect how the balance of discovery and pre-trial proceedings unfold. The plaintiffs seek sanctions including (i) preventing Sandberg and Zients from moving for summary judgment, (ii) raising the burden of proof for their affirmative defenses, and (iii) precluding certain testimony at trial. Whether the court grants those sanctions will affect how the parties prepare for trial and present their evidence. The proper time to consider the plaintiff's motion is now.

## B. Was There A Duty To Preserve The Emails?

The first question under Rule 37(e) is whether the ESI "should have been preserved."[48] "Rule 37(e) does not apply . . . when information or evidence is lost before a duty to preserve attaches."[49]

A party must "preserve potentially relevant evidence as soon as the party either actually anticipates litigation or reasonably should have anticipated litigation." [50] "A party is not obligated to preserve every shred of paper, every e-mail

---

[48] Ct. Ch. R. 37(e)

[49] *Goldstein*, 310 A.3d at 571 (quoting *Living Color Enter., Inc. v. New Era Aquaculture, Ltd.*, 2016 WL 1105297, at *4 (S.D. Fla. Mar. 22, 2016).

[50] *Id.*; *see also Beard Rsch., Inc. v. Kates*, 981 A.2d 1175, 1187 (Del. Ch. 2009).

or electronic document."[51] But, a party is obligated to "preserve what it knows, or reasonably should know, is relevant to the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discover and/or is the subject of a pending discovery request."[52]

"The duty to preserve extends to those employees likely to have relevant information—the 'key players' in the case."[53] "An organization's decision to circulate a litigation hold is a strong indication that a duty to preserve evidence exists, because it shows that the organization subjectively anticipates litigation."[54]

Sandberg and Zients do not contest their duty to preserve.[55] In March 2018, the Company issued a legal hold to Sandberg that covered "all correspondence," including emails, concerning "platform policy, data policy/data use/privacy policy, or privacy settings," "compliance with the 2011 FTC Consent Order," "developer access to user data," "Cambridge Analytica," and related topics.[56] In May, the Company

---

[51] *Seibold v. Camulos P'rs LP*, 2012 WL 4076182, at \*23 (Del. Ch. Sept. 17, 2012).

[52] *Id.*

[53] *Goldstein*, 310 A.3d at 572–73 (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003).

[54] *Id.* at 573.

[55] DOB ¶ 13.

[56] Ex. 1.

15

notified Zients about the legal hold when he joined the Board.[57] In these communications, the Company instructed Sandberg and Zients that their preservation obligation extended to existing and to-be-created documents, wherever they might exist.[58]

Sandberg and Zients also received "FAQs Regarding Legal Holds."[59] The answers to the FAQs emphasized the obligation to preserve "any information related to the Matter," including information on personal devices and accounts.[60] Zients and Sandberg received frequent reminders about their preservation obligations.[61] And the Company's outside counsel offered to work with Zients to collect potentially responsive materials.[62]

Sandberg and Zients had an affirmative duty to preserve their personal emails as evidence. The first prerequisite for sanctions is therefore satisfied.

---

[57] Mot. ¶ 16; DOB ¶ 6.

[58] Mot. ¶ 16; Ex. 3–4 (Sept. 16, 2019 and March 27, 2019 FAQs for the legal hold).

[59] Mot. ¶ 17.

[60] Ex. 4 (Mar. 27, 2019 FAQs for the legal hold).

[61] Mot. ¶ 17; Ex. 23–27 ("REMINDER" notices from July 3, 2018, February 7, 2019, August 16, 2019, September 2, 2019, and September 16, 2019).

[62] Ex. 6.

## C.    Are The Emails Lost?

The second question in the Rule 37(e) analysis is whether the ESI "is lost."[63] "Information is lost for the purposes of Rule 37(e) only if it is irretrievable from another source, including other custodians."[64] "Because [ESI] often exists in multiple locations, loss from one source may often be harmless when substitute information can be found elsewhere."[65]

The defendants argue that messages form Sandberg and Zients's personal accounts should not be considered "lost" for purposes of Rule 37(e) because they would not have been relevant or responsive. The Rule 37(e) inquiry does consider relevance and responsiveness, but as part of the analysis of prejudice. When analyzing whether ESI is lost, the court asks whether it could be obtained from other sources.

Here, the defendants collected some of the otherwise lost ESI from other sources. They located 57 emails sent to or from Sandberg's Gmail account, and they identified 415 emails sent to or from Zients's personal email address. Those emails were not lost and cannot support a spoliation sanction.

Otherwise, the ESI from Sandberg and Zients's personal accounts is lost. It cannot be recovered from their accounts, and it cannot be obtained from other sources.

---

[63] Ct. Ch. R. 37(e).

[64] *Goldstein*, 310 A.3d at 574.

[65] *Id.* (quoting Fed. R. Civ. P. 37(e) advisory committee's notes).

**D.    Were The Emails Lost Due To A Failure To Take Reasonable Steps To Preserve Them?**

The third question in the Rule 37(e) analysis is whether the ESI was lost "because a party failed to take reasonable steps to preserve it."[66] "ESI discovery involves five fundamental steps: (1) identification, (2) preservation, (3) collection, (4) review, and (5) production."[67] The issues here are identification and preservation.

When a party has a duty to preserve evidence, that "party must act reasonably to preserve the information that it knows, or reasonably should know, could be relevant to the litigation, including what an opposing party is likely to request."[68] "The standard is reasonableness."[69]

The first step in preserving evidence is "taking reasonable steps to identify information that should be collected and preserved."[70] This process requires "locating the relevant people and the locations and types of ESI."[71] The relevant people are those "who have custody of the relevant ESI or the ability to obtain the ESI."[72]

---

[66] Ct. Ch. R. 37(e).

[67] *Goldstein*, 310 A.3d at 575 (quoting *DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 923 (N.D. Ill. 2021)).

[68] *Goldstein*, 310 A.3d at 575.

[69] *Id.*

[70] *Id.*

[71] *Id.* (internal quotations marks omitted).

[72] *Id.* (internal quotations marks omitted).

Counsel must interview these individuals "to learn the relevant facts regarding ESI and to identify, preserve, collect, and product the relevant ESI."[73] "The relevant locations are those places where the ESI can be found so that it can be both (a) preserved and (b) collected and produced. Although both are necessary, preserving ESI is distinct from collecting and producing ESI."[74]

After identifying the reasonably likely sources of ESI, "the party must take reasonable steps to collect and preserve it."[75] The party need not preserve all documents in its possession; "it must preserve what it knows and reasonably ought to know is relevant to possible litigation and is in its possession, custody, or control."[76] In determining reasonableness, a court "should be sensitive to the party's sophistication with regard to litigation in evaluating preservation efforts; some litigants, particularly individual litigants, may be less familiar with preservation obligations than others who have considerable experience in litigation."[77]

Simply circulating a litigation hold is not sufficient.[78] "The organization must take steps to ensure the recipients of the hold understand what it means and abide

---

[73] *Id.* (internal quotations marks omitted).

[74] *Id.* (internal quotations marks omitted).

[75] *Id.* at 576.

[76] *Id.* (internal quotations marks omitted).

[77] *Id.* (internal quotations marks omitted).

[78] *Id.* at 577.

by it."[79] "The organization also must suspend or modify routine document retention or document destruction policies so that evidence is not lost."[80]

Individuals must take similar steps. "[T]hey must disable auto-delete functions that would otherwise destroy emails or texts."[81] "They also must back up data from personal devices before disposing of them."[82] Failing to disable the auto-delete setting or back up messages before deletion demonstrates that a defendant acted unreasonably.[83] Individuals may not claim ignorance. "After receiving a litigation hold, an individual must take steps to determine what is necessary to comply."[84] This includes learning what is necessary "to prevent destruction or automatic deletion."[85]

Under these principles, Sandberg failed to take reasonable steps to preserve ESI. Starting on March 22, 2018, Sandberg had a legal duty to preserve evidence, including ESI, relating to the topics identified in the legal hold. Sandberg is a highly sophisticated individual who served as the Company's Chief Operating Officer and as

---

[79] *Id.*

[80] *Id.*

[81] *Id.*

[82] *Id.*

[83] *See id.*

[84] *Id.*

[85] *Id.*

a director during the events in question. She knew what was required, and she could have consulted with Company counsel if she had any doubts.

Sandberg did not take reasonable steps to identify likely sources of ESI. The legal hold told Sandberg to preserve "any pertinent evidence in our possession that could be relevant to the matter."[86] The legal hold specifically referenced "all correspondence (such as email, instant messages, Skype messages, WhatsApp messages, FB Messages, text messages, FB Group posts, and letters)."[87]

Nor did Sandberg's counsel provide transparency when plaintiffs' counsel raised the issue.[88] The plaintiffs asked about possible sources of ESI on November 3, 2023.[89] No one identified Sandberg's Gmail account until May 2024, six months later.[90] It should not have taken that long to respond. And the response counsel gave was confounding. Counsel stated in an interrogatory response that "[p]rior to this litigation, Defendant Sandberg had a practice of regularly deleting emails from her

---

[86] Ex. 1.

[87] *Id.*

[88] *See, e.g.,* Ex. 8 at 6–7 (Nov. 3, 2023 email from S. Greenspan to G. Rice, J. Cree, and J. Hymes); Ex. 8 at 1 (Nov. 14, 2023 email from J. Hymes to G. Rice, R. Smith, and S. Greenspan); Ex. 9 at 6–8 ; Ex. 10; Ex. 11; Ex. 12; Ex. 13. Between November 3, 2023 and March 28, 2024, plaintiffs' counsel repeatedly inquired about the individual defendants' collection of non-Meta ESI. Defense counsel gave vague updates on the progress of this collection.

[89] *See* Ex. 8.

[90] Ex. 15.

Gmail account that are over 30 days old."[91] That response did not state when the practice began, did not state when it ended, and did not explain whether Sandberg used an autodelete feature or deleted emails selectively. The defendants also failed to respond forthrightly to follow-up inquiries that sought to pin down answers.[92] Sandberg had an obligation to preserve the emails in her Gmail account, and her counsel had an obligation to address that issue earlier in the case. Once the plaintiffs asked about Sandberg's Gmail account, counsel had an obligation to provide answers.

Counsel's failure to give a straight answer in Sandberg's interrogatory responses or when answering plaintiffs' questions supports an inference that Sandberg was *not* using an auto-delete function but rather picking and choosing which emails to delete.[93] That practice violated her obligation to produce documents. The fact that the Company preserved some of the emails from Sandberg's Gmail account for other litigations[94] does not mean that Sandberg took reasonable steps to collect and preserve her Gmail communications for this litigation. She plainly didn't.

Zients also failed to take reasonable steps to collect and preserve ESI. Zients received the legal hold after joining the Board in May 2018. Zients relied primarily

---

[91] *Id.*

[92] *Id.*

[93] Sandberg's interrogatory responses simply stated: "Prior to this litigation, Defendant Sandberg had a practice of regularly deleting her emails from her Gmail account that are over 30 days old." Ex. 15 at 9.

[94] Ex. 15 at 9.

on non-Meta email accounts for Company-related communications. For the same reasons as Sandberg, Zients failed to take reasonable steps to identify his personal email account as a likely source of ESI.

Zients used an auto-delete function on his personal email that deleted data approximately every six months.[95] On June 18, 2024, the individual defendants represented that "[f]ollowing investigation and consultation with a forensic ediscovery specialist, the individual defendants do not believe that any emails from [Zients's] personal account in the collection period were retained on any local media."[96] On August 9, the individual defendants confirmed that Zients's counsel did not collect any emails from his personal account and that his emails were irretrievably lost.[97] By failing to disable the auto-delete function on his personal email account, Zients lost his emails and did not take reasonable steps to collect and preserve the ESI.

### E.  Prejudice

The imposition of sanctions for spoliation requires a showing of prejudice. Absent prejudice, the failure to preserve ESI need not be remedied because, by definition, no harm was done.

---

[95] *Id.* at 10.

[96] Ex. 17.

[97] Ex. 21.

23

"Prejudice exists when spoliation prevents a party from obtaining and potentially using relevant evidence."[98] Determining whether prejudice exists is difficult because spoliation creates an evidentiary vacuum. Proving the lost evidence is relevant is difficult "precisely because the evidence no longer exists."[99]

The prejudice analysis starts by requiring that the requesting party "provide some minimal explanation as to why the lost ESI could have been relevant and either admissible in its own right or reasonably likely to lead to the discovery of admissible evidence."[100] The mere fact that evidence is lost in not sufficient to demonstrate prejudice; the requesting party must "provide a plausible explanation as to way evidence could have been relevant such that the failure to preserve is prejudicial."[101]

Once the party seeking sanctions meets that initial burden, then the party that failed to preserve the ESI must convince the court that the lost ESI did not result in prejudice. Possible reasons include that the material could not have been relevant, would not have been admissible or potentially have led to the discovery of admissible evidence, or otherwise could not have been used by the requesting party to its advantage.[102]

---

[98] *Goldstein*, 310 A.3d at 583.

[99] *Id.*

[100] *Goldstein*, 310 A.3d at 585.

[101] *Id.* at 584.

[102] *Id.* at 585.

Here, the plaintiffs have made a showing sufficient to demonstrate prejudice. Both Sandberg and Zients regularly used their personal email accounts to communicate about Company business and compliance issues. Both Sandberg and Zients deleted or allowed communications to be deleted after receiving legal holds and reminders. The plaintiffs now lack access to that evidence. They cannot use the emails to question witnesses; they cannot use the emails as affirmative proof; they cannot use the emails to cross examine witnesses. The burden therefore shifts to the spoliators to show a lack of prejudice.

### 1.    Sandberg's ESI

Sandberg failed to make a convincing case against a finding of prejudice.

She argued that no relevant ESI was lost—and hence there could be no prejudice—because she did not use her Gmail account to conduct Company business in a significant way. To justify that claim, Sandberg cites discovery statistics about emails that were preserved and collected from thirty-two custodians and dozens of unique custodial sources. In that collection, there were only fifty-seven emails sent to or from Sandberg's Gmail account.[103] There were 11,576 emails from her Company account.[104] The defendants also reviewed approximately 3,800 emails from

---

[103] Defendants cited fifty-six emails in their opposition brief. At the time of the hearing, defendants updated the number to fifty-seven. *See* Hearing Tr. at 28.

[104] DOB ¶ 15; Readinger Aff. ¶ 6.

Sandberg's Gmail account that were preserved and that hit on the negotiated search terms. The defendants represent that none were responsive.[105]

It does not follow from those statistics that Sandberg did not use her Gmail account for Company business. The defendants admit she did, and the contents of the fifty-seven emails that were preserved shows that she did. Those emails discussed:

- That Facebook users were "feeling fundamentally insecure about protecting themselves;"[106]

- The Company's lagging "trust among FB regular users,"[107]

- Regulatory matters involving the "FTC, SEC, [and] state AGs;"[108]

- The "reputational danger" Cambridge Analytica posed to the Company,[109]

- "FB privacy,"[110] and

- "US Privacy Legislation."[111]

---

[105] Readinger Aff. ¶ 6; Ex. 21 at 1. While defendants produced and reviewed a large number of documents, 93% of their production consisted of re-producing documents from other privacy-related litigation. Huffman Aff. ¶ 2. Only 1.1% of the documents the Company produced are from Sandberg's custodial files; none are from Zients's custodial files. *Id.*

[106] Ex. 28 at 3.

[107] Ex. 39.

[108] Ex. 29.

[109] Ex. 30.

[110] Ex 38.

[111] *Id.*

Because Sandberg selectively deleted items from her Gmail account, it is likely that the most sensitive and probative exchanges are gone.

The record provides a sufficient basis to conclude that Sandberg failed to preserve ESI that would have been relevant to this action. The loss of that ESI constitutes prejudice.

### 2. Zients' ESI

In contrast, Zients demonstrated that his lost ESI was unlikely to be responsive and hence the loss was not prejudicial.

The defendants assert that Zients's "relevant communications were overwhelmingly via official email and board-portal distributions to all of the directors on the board or its committees."[112] They represent that they reviewed over 6,500 documents from Zients's company and business accounts that hit on the search terms.[113] The defendants found 415 emails sent to or from Zients's personal email address.[114] Of these communications, 411 went to the Board, a committee, or also included other Company directors or employees.[115] As with Sandberg, the defendants

---

[112] DOB ¶ 17.

[113] *Id.*; Readinger Aff. ¶ 11.

[114] Readinger Aff. ¶ 12.

[115] *Id.* Defendants' counsel represents that the "remaining four documents are emails between Zients and a fellow director." *Id.*

argue that plaintiffs failed to support an inference that the lost ESI contained emails that were both relevant and unique.

As with Sandberg, it does not follow from those statistics that Zients did not use his personal email account for Company business. Because Zients's emails are lost, there is no way to determine what they could have contained. Nevertheless, in contrast with Sandberg, there is less reason to think that Zients lost relevant ESI.

First, Zients was an outside director, not a C-suite officer, so he logically would have been less immersed in Company operations and likely received communications comparable to what other directors received.

Second, Zients joined the Board after the Company's run of fines and the Cambridge Analytica scandal. He did not participate in those events in real time. Emails relating to those topics would have been in the nature of after-the-fact reviews or efforts to avoid similar problems in the future.

Zients put himself at risk of sanctions by maintaining the auto-delete feature on his personal email account, after receiving a legal hold instructing him to preserve potentially relevant documents, after receiving numerous reminders, and even after consulting with counsel. But the plaintiffs have not made a showing sufficient to support a conclusion that Zients lost responsive ESI. The analysis of Zients's email stops here.

## F.     The Sanctions Necessary To Cure The Prejudice Sandberg Caused

Rule 37(e) authorizes a range of sanctions to cure prejudice. The court can deem certain facts to be true, preclude the use of certain evidence, strike particular

pleadings or claims, modify the burden of proof for particular issues, allow additional discovery, enter default judgment, and award expenses.[116] Before the court can draw an adverse inference or enter default judgment, the court must conclude that the party "acted recklessly or with the intent to deprive another party of the information's use in the litigation."[117]

Here, the plaintiffs ask the court to

- increase Sandberg and Zients's burden of proof for affirmative defenses to the standard of clear and convincing evidence;

- preclude Sandberg and Zients from testifying about information received through or sent from their personal email accounts as part of any defense in their case in chief;

- prohibit Sandberg and Zients from moving for summary judgment; and

- award plaintiffs their expenses.

None of those sanctions requires a culpable mental state.

In this case, the prejudice arises from the loss of the emails from Sandberg's Gmail account, the plaintiffs' inability to use those materials as evidence, and the defendants' ability to testify with fewer constraints due to the absence of contemporaneous emails from Sandberg's personal account.

To address that prejudice, the court will impose one sanction the plaintiffs have requested: raising Sandberg's standard of proof by one level on any issue where she

---

[116] *See* Ct. Ch. R. 37(b); *Terramar Retail Ctrs., LLC v. Marion #2-Seaport Tr. U/A/D June 21, 2002*, 2018 WL 6331622, at *14 (Del. Ch. Dec. 4, 2018).

[117] Ct. Ch. R. 37(e)(2).

29

bears the burden of proof.[118] In *Genger*, the court went further, holding that the spoliator "will be unable to prevail on any material factual issue if the only evidence in support of his own position is his own testimony."[119] Under that ruling, "[a]bsent corroborating testimony or documents, [the spoliator's] mere word will be insufficient to meet his burden of persuasion."[120] In this case, there is other documentary evidence from Sandberg, so the court will consider her testimony and give it the weight due. But the standard of proof required for the affirmative defenses Sandberg raises will be clear and convincing evidence.

This is a meaningful sanction, but does not rise to the level of a burden shift. The burden of proof "determine[s] what happens if there is no credible evidence on a topic, or if there is some credible evidence, but not enough that either side could carry the evidence by a preponderance."[121] In such a case, the party with the burden of proof loses. In a typical civil case, the plaintiff bears the burden of proof. Shifting the burden of proof changes who wins in the absence of sufficient credible evidence.

Increasing the burden of proof does not have the same effect. It does not force Sandberg to carry a burden on issues where she would not otherwise have to come

---

[118] *TR Invs., LLC v. Genger*, 2010 WL 541687, at *2 (Del. Ch. Feb. 3, 2010).

[119] *Id.*

[120] *Id.*

[121] *Goldstein*, 310 A.3d at 586 (discussing how presumptions and burdens operate).

forward with proof. It only affects issues where Sandberg already had the burden of proof, such as her affirmative defenses.

The plaintiffs also asked the court to preclude Sandberg from testifying about information received through or sent from their personal email accounts as a part of their case in chief. Precluding testimony is a more serious sanction and not warranted here. Sandberg's deletions prejudiced the plaintiffs, but the defendants produced many of Sandberg's emails from other sources. The plaintiffs can cross-examine Sandberg on any testimony she gives.

The plaintiffs additionally asked the court to prevent Sandberg from moving for summary judgment. This is a fact-specific case, so it is highly unlikely that summary judgment will be an efficient procedural vehicle for resolving part or all of it. If Sandberg moves for summary judgment, and if the plaintiffs believe that emails from her Gmail account would have been relevant to the summary judgment motion, then the court will take that into account when considering the motion. There is no reason at this point to deny summary judgment in advance.

Finally, the plaintiffs are awarded the expenses they incurred pursuing the spoliation issue against Sandberg. The plaintiffs may recover not only the expenses relating to the motion itself, but also expenses for the effort required to pin down Sandberg's positions and confirm that the ESI was not available from other sources. The plaintiffs are not awarded the expenses they incurred pursing the spoliation issue against Zients.

Some of their expenses may overlap. If the plaintiffs would have incurred expenses to pursue the motion against Sandberg, then they can recover those expenses, even if the expenses also related to Zients.

The parties will exchange information about their respective attorneys' fees and costs and attempt to reach accord in good faith. If they cannot agree, the plaintiff may file an application.

## III. CONCLUSION

The motion for sanctions is granted in part. Sandberg must prove her affirmative defenses by clear and convincing evidence and plaintiffs are awarded their expenses as set forth in the rulings in this decision. The motion is denied with respect to the sanctions requested against Zients.